STATE v. WALLACE AGEY.

(Filed 3 May, 1916.)

**1. Insurance Laws — Criminal Law — Investment Companies — License — Statutes.**

A company organized in another State and having agents here for the purpose of selling small lots of land upon a certain cash payment, the balance payable in a term of years, with obligation on the part of the company to set out and cultivate figs thereon, with guarantee as to quantity of bushes thereon and price of figs at the end of the period, and to convey the land to the purchaser, or his heirs or assigns in the event of his death if the deferred payments are promptly met by him or them according to his obligations, falls within the intent and meaning of our statutes, Revisal, sec. 4805, and the amendatory acts of 1911 and 1913, being section 4805a, Gregory's Supplement, requiring that the company be licensed by the Insurance Commissioner when he is satisfied that the company is safe and solvent and has complied with the laws of this State applicable, etc.

**2. Same—Police Powers—Commerce—Constitutional Law.**

Where a foreign corporation offers, through its agent here, small lots of land for sale, obligating itself to cultivate the lands under stated terms, and upon the full payment of the purchase price, in installments during a term of years, to make title to the purchaser, etc., the transaction cannot be regarded as commerce, or affected by the Constitution or Federal statutes regulating interstate commerce; and our statutes requiring that to do business here they be licensed are valid as a proper police regulation. ·Revisal, sec. 4805, amended by Laws 1911, 1913, being section 4805a, Gregory's Supplement.

**3. Insurance—Courts — Judicial Notice — Criminal Law — Investment Companies.**

The Court, in this case, takes judicial notice that by the United States census Tatnall County, Georgia, is the largest county in that State, covering 1,100 square miles; that much land can be found in that section of comparatively small value, as also the services to be performed by the corporation, in comparison with the price to be paid for the land. On the facts in this case, the failure or refusal of the corporation to comply with the requirements of our statutes to obtain license makes the defendant, its agent, guilty of the offense charged. Revisal, sec. 4805, amended by Laws 1911 and 1913, Gregory's Supplement, sec. 4805a. .

APPEAL by defendant from *Allen, J.,* at November Term, 1915, of ALAMANCE.

*Attorney-General Bickett for the State.*
*A. Y. Burrows and J. Dolph Long for defendant.*

CLARK, C. J. The defendant is indicted under Rev., 4805, and ch. 196, Laws 1911, and ch. 156, Laws 1913, being sec. 4805a of "Gregory's Supplement" (amending said Rev., 4805), known as the "Blue-sky Law."

Upon the special verdict the court was of opinion that the defendant was guilty, and the jury so found, and from the judgment thereon the defendant appealed.

The special verdict finds that the foreign corporation represented by the defendant is authorized under the laws of the State of Tennessee to buy and sell real estate, and that it has bought large tracts of land in Tatnall County, Georgia, which it has divided, and is selling these tracts of land for fig orchards, and, in some instances, is contracting to furnish and set out fig trees on said tracts for a stipulated period of time, and has not obtained a license so to do of our Insurance Commissioner.

The indictment and the special verdict, which are set out in full, present two questions:

1. Whether such contract is within the provisions of the statute.

2. If so, is the statute invalid as a regulation of interstate commerce?

As to the first proposition, ch. 196, Laws 1911: "Before any bond, *investment,* dividend, guarantee, registry, title guarantee, debenture, or such other like company (not strictly an insurance company as defined in this chapter), or any individual, corporation, or copartnership who shall be agents, offer for sale or sell the stocks, bonds, or *obligations of any foreign corporation,* whether organized or to be organized or being promoted, shall be authorized to do business in this State, it must be licensed by the Insurance Commissioner, which the Commissioner is authorized to do when he is satisfied that such company or corporation is safe and solvent and has complied with the laws of this State applicable to fidelity companies and governing their admission and supervision by the Insurance Department. If such company is chartered and organized in this State and has its home office within the State it may, if a stock company, commence business with a capital stock of twenty-five thousand dollars, provided it is solvent to the extent of not less than fifteen thousand dollars. The license issued to such companies and their agents shall be issued and paid for as provided for those of insurance companies."

Gregory's Supplement, sec. 4805a, subsec. 1 (ch. 156, Laws 1913), provides: "Every corporation, company, copartnership or association, all of which are in this act termed company, organized, proposed to be organized, or which shall hereafter be organized without this State, whether incorporated or unincorporated, which shall in this State sell or negotiate for sale any stocks, bonds, or other *evidences of property,* or interest in itself or any other company, all of which are in this act termed securities, upon which sale or proposed sale the whole or any part of the proceeds are used, or to be used, directly or indirectly, for the payment of any commission or other expenses incidental to the organization or promotion of any such company shall be subject to this act."

The question, therefore, is whether the company represented by the defendant is an *"investment"* company, or whether the defendant was offering for sale the "obligation of any foreign corporation," within the

meaning of section 4805, or whether the defendant, as the agent of the foreign corporation, was offering for sale in this State *"evidences of property,* or interest in itself or any other company," within the meaning of section 4805a.

In addition to the parts of the special verdict referred to, it appears from the exhibit, which was made a part of the special verdict, that in an application of a prospective purchaser the following stipulations appear:

"In event of death of purchaser hereof, warranty deed will be delivered to his or her estate, provided payments are not in arrears."

"The company guarantees to scientifically develop, cultivate, prune, and take care of said orchard plot or plots for five years, and, upon completion of the payments as above set forth, to make, execute, and deliver to the purchaser hereof a general warranty deed for the number of plots mentioned above, which shall have at that time 200 living trees thereon." And "The company guarantees the purchaser hereof 3 cents per pound for all fruit grown on said trees delivered at the preserving plant in good condition."

It will be apparent from the facts set out in the special verdict that the contract offered by the defendant for his company comes within at least three provisions of the statute.

It is an *"investment* company" offering to the public an investment in lands and fig orchards in Georgia. It is also offering the "obligations of said corporation" to cultivate said land, and giving its contract to make title on compliance with certain terms; and, lastly, it is offering for sale, within the terms of Laws 1913, ch. 156, such "evidences of property." Under all three of these provisions it is within the scope of the act.

This transaction took place entirely within the State of North Carolina, and is subject to the police power of this State. There can be no interstate commerce unless, as a part of the transaction, there is in contemplation some act of transportation between two or more States. In this case the defendant was selling to a citizen of this State an obligation to make title to real estate in Georgia, and, upon compliance with the terms therein stated, to make title to a certain small lot of land in Georgia. There is nothing to be transported either from this State to Georgia or from Georgia to this State. There is no element of interstate commerce involved. *Paul v. Virginia,* 75 U. S. (8 Wall.), 168, at p. 183.

The intent of the statute is to protect our people, under the police power, from fraud and imposition by irresponsible nonresident parties. These instances have been so frequent that the U. S. Postoffice Depart-

ment has estimated that the people of this country have been losing annually more than one hundred millions of dollars by speculative schemes which have no more substantial basis than so many feet of "blue sky."

To prevent such impositions on its people is an essential duty of government. If there is fraud and imposition in a case of this kind the parties imposed on can rarely go to Georgia and hunt up the guilty party, even if to be found there, and undergo the expense incident thereto. Even if this could be done, there would rarely be any assets which could be applied to the demands of the plaintiff. This State has sought to protect its people, not by forbidding such transactions, but by the very reasonable requirement that when parties, whether incorporated or not, acting under the authority, actual or merely asserted, of another State, propose to do such business in our borders they must submit their statement of assets and the nature of their business to the Insurance Commissioner of this State, who will issue his license to do business here when he "is satisfied that the company or corporation is safe and solvent and has complied with the law of this State applicable to fidelity companies and governing their admission and supervision by the Insurance Department," and making it indictable to transact such business in this State until such license has been obtained. This is a reasonable requirement under the police power of this State

There is nothing in the Constitution of the United States or in the Constitution of North Carolina which prohibits the people of North Carolina, acting through their Legislature, from making so reasonable and just a regulation for the prevention of fraud and imposition. If the 39 men who signed the Constitution at Philadelphia more than a century and a quarter ago had intended to so cripple the State governments that they could not thus protect their own people, such purpose is not expressed in the Constitution, and if they had so designed they would have earned the execration of the public and not the honorable place which they hold in the hearts of posterity.

Without passing upon the *bona fides* of this particular proposition, there is enough before us to require this supervision and license by the Insurance Commissioner before the defendant's company could proceed with its proposition. The proposition, in brief, is that the defendant's company will sell to the intending purchaser a lot of land 120 x 450 feet (which is about 1¼ acres), for which they require $600 to be paid, *i. e.,* near $500 per acre. Of this $600, $120 must be paid down at signing of the paper and another $120 during the first year, and the company does not agree to set out any fig cuttings till after said $240 is paid. The remainder of the $600 is to be paid in monthly installments during the next five years. The company reserves the title, giving merely its unsecured promise to make title on payment of all the purchase money, and

providing that if there is default in any one payment all the deferred payments shall at once become due and payable. The company agrees to "cultivate, prune, and take care of said orchard plot for five years," and, upon final completion of the payments stipulated for ($600 for each of said 1¼-acre lots), to make title to the lot, "which shall have at that time 200 living trees thereon"—which may, or may not, mean "if" they have 200 living trees thereon.

The obligation does not stipulate that the company will set out 200 trees or cuttings thereon, nor that the company shall make title if there should not be 200 trees living thereon at the end of said five years. But taking it that it is intended to obligate the company to set out said fig cuttings (the usual mode) and to obligate further that there shall be 200 fig trees thereon at the end of five years, still there is no assurance that the company now has any assets, nor is there any security to the buyer that at the end of five years and after payment of the said $600 (for about 1¼ acres of land) there will be any means to enforce specific performance or recover damages if the company has or has not set out the 200 fig trees on the land, or there shall or shall not be 200 living trees on the lot at the end of five years, or any guarantee that there will be any assets to which the purchaser can look for damages. The defendant company has failed and refused to lay before the Insurance Commissioner its schedule of assets, the name of its corporators or managers, and to procure the license which the statute of this State requires after investigation by its official of the reliability of the company which offers this scheme to the public.

We can take judicial notice of the fact that by the U. S. census Tatnall County, Georgia, is the largest county in that State, over 1,100 square miles, being larger than Wake County in this State. It is not specified in what part of that large county these lots are to be found, if they are there. We know that the county lies some 60 miles west of Savannah in the coastal region of Georgia, where there are large flat areas of land known in this State as "pocosins," which a few years ago could be bought at a few cents per acre. Even if the land has been actually bought by this company, of which there is no assurance, for it has refused the required investigation, it is offering the same for sale under the scheme at nearly $500 per acre. If the company really agrees to set out 200 fig trees to the acre (after $240 has been paid on each 1¼-acre lot), it is common knowledge that fig trees are set out by cuttings, and that probably the 200 cuttings could be put on the lot at a cost, including price of land, of not more than $5 per lot.

It is true there is an agreement to prune and cultivate the said trees for five years, but there is no guarantee that this will be done, or as to the manner in which it shall be done, or of damages on failure to do so. In the meantime the purchaser must have paid his $240 down

and is under obligation to make payment of $360 more, which promise to pay may be transferred or assigned to some holder in due course before maturity. In short, the proposition, if honestly complied with, would probably not call for an expenditure of more than a very small fraction of $500 for each lot, including the purchase price of the land (if any is really bought), and including the setting out of 200 fig cuttings, if set out. As to the cultivation, if really made, the cost would probably be more than recouped to the seller in the corn or other crop grown thereon, if the land will produce crops. The defendant's company, however, has declined to lay before the Insurance Commissioner any evidence that it has bought any land, or that it has any assets, and offers merely its anonymous obligation to "prune and cultivate."

The State has a right to require evidence of good faith, of assets, and of responsibility from nonresident parties offering to sell to our people "investments" or "evidences of property" on such contracts as this. The defendant's company has failed to do this, in defiance of our laws, and upon the special verdict he, as its agent, has been properly found guilty.

Some years ago parties offered, upon a somewhat similar scheme, "lots in New York City." When one of the purchasers investigated the matter he found that the lots in question were within the nominal limits of that great city, but were under water altogether, or at least at high tide. In the same manner small pieces of land, a few feet in area, have been capitalized at millions of dollars in copper mining stock, and stock sold to the public when there was no probability of an ounce of copper being on the property, or, if any, at not less than a mile beneath the surface, and the swindlers who sold the stock possessed no assets, and had no probability of any, beyond the cash received from the credulous and confiding public for this fictitious stock sold by unscrupulous manipulators and their agents.

Whether the scheme under which the defendant was acting offers any probability of realizing the promises made for the company, or whether there is any *bona fides,* the outline which has been given does not give much assurance. But, however this may be, the State has a right to require that when such propositions are offered to our people there shall be an investigation as to the reliability of the company, the character of its promoters and managers, and the nature of its business and the amount of its assets, and that it shall not offer its stock, its investments, its "evidence of property," until the Insurance Commissioner has examined into its reliability and assets and issued license to such company to do business in this State. The company which the defendant purports to represent has not done this, and he has been properly found guilty.

No error.