Frank K. Prohaska, Appellant, v. The Hemmer-Miller Development Company and John G. Hemmer, Appellees.

Gen. No. 33,703.

332

Opinion filed March 11, 1930. Rehearing denied March 24, 1930.

SOLBERG, HUMMELAND & WINANS, for appellant; KELLAM FOSTER, of counsel.

CHURCH, McMURDY, HARPEL & WAGNER, for appellees; ROBERT McMURDY and HOWARD M. HARPEL, of counsel.

MR. JUSTICE GRIDLEY delivered the opinion of the court.

In an action in assumpsit, commenced September 17, 1928, against The Hemmer-Miller Development Company (a South Dakota corporation), John G. Hemmer, its president, and Kirk S. Miller, its treasurer, the company and Hemmer were served with process, but Miller was not served. The company had an office at 35 South Dearborn Street, Chicago, and plaintiff, a resident of Chicago, sought to recover, by virtue of the provisions of section 37 and other sections of the Illinois Securities Law (Cahill's St. 1923, ch. 32, ¶ 290, p. 926), certain moneys which he had paid to the company, in accordance with a certain written agreement executed at Chicago, and also attorney's fees. Plaintiff's declaration consisted of two special counts and the consolidated common counts, which last mentioned counts subsequently were withdrawn. The company

and Hemmer filed a general and special demurrer to the special counts. On July 8, 1929, after arguments, the court sustained the demurrer and, upon plaintiff's election to stand by the counts, entered judgment against plaintiff for costs and this appeal followed.

The written agreement, set forth in full in each count, is on a printed form with the blanks filled in by writing or typewriting, and it has an attached rider. After stating that the agreement, dated March 25, 1925, is made between the development company, first party, and Frank K. Prohaska, of 2216 South Kirkland Avenue, Chicago, second party, it is provided that, if Prohaska shall first make the payments and perform the covenants on his part, the company "hereby covenants and agrees to convey and assure to him, in fee simple, clear of all incumbrances, by a good and sufficient Warranty Deed, the lot—piece—or parcel—of ground situated in the County of Fall River and State of South Dakota, known and described as the East Half (½) of the Northeast Quarter (¼) of Section twenty-nine (29) in Township eleven (11), South of Range Four (4), East of the Black Hills Meridian."

It is further provided that Prohaska "hereby covenants and agrees to pay to the Company the sum of $8,000, one third ($2,666.66) in cash, and the balance *as hereinafter provided in the rider attached hereto* with interest at the rate of 5 per cent per annum, payable annually, on the whole sum remaining from time to time unpaid, and to pay all taxes, assessments or impositions that may legally be levied or imposed upon said land, subsequent to the year 1924."

It is further provided that, in case of Prohaska's failure to make "either" of the payments or any part thereof or perform any of his covenants, this contract shall at the option of the company be forfeited and determined, and Prohaska shall forfeit all payments made by him and the same shall be retained by the

company in full satisfaction and in liquidation of all damages by it sustained, and it shall have the right to re-enter and take possession of the premises, etc.

It is further provided that, "upon the completion of this agreement, the Company agrees to deliver to the purchasers a good and sufficient warranty deed free and clear from all incumbrances, except the taxes, assessments and impositions which the purchasers have herein agreed to pay"; that the "time of payment shall be the essence of this contract"; and that all covenants and agreements shall extend to and be obligatory upon the heirs, executors, administrators and assigns of the respective parties, etc. The attached rider is as follows:

"It Is Agreed that the Company shall harvest all crops upon said land during the life of this agreement and the net profit therefrom shall be applied to the purchase price of the land and interest.

"The Company agrees during the calendar years 1925 and 1926 to break, seed, cut and thresh and pay for all labor without cost to the purchasers; seeding to be Grimm Certified Alfalfa seed.

"The purchasers agree to pay the expense of all hail insurance during the life of this contract, and in case of loss, the same shall be applied to the purchase price of the property.

"This contract is not transferable without the written consent of the Company."

The agreement is signed by Prohaska and by the company, by Hemmer, its president and by Miller, its treasurer, and it is duly acknowledged by both parties before a notary public of Cook county, Illinois.

In the first count of plaintiff's declaration it is alleged that at the time of execution of the agreement "and at divers times thereafter," in accordance with its terms, plaintiff paid to the company the total sum of $3171.18; that "said agreement was a security in Class

C," under the statute known as the Illinois Securities Law, Cahill's St. ch. 32, ¶ 254 *et seq.;* that prior to the execution of the agreement the company had not filed in the office of the Secretary of State of Illinois "the statements, documents or instruments specified in and required by section 7 of said statute" to be there filed; that "said agreement was made in violation of the provisions of said Illinois Securities Law"; that plaintiff, as purchaser under the agreement, "has elected and elects to declare the same null and void and herewith brings into court and tenders to the defendant Company said agreement"; and that by means thereof the defendant company has become liable to pay plaintiff said sum of $3171.18, etc.

In the second count the allegations are substantially the same, except that it is alleged that "said agreement was a security in Class D" under said Securities Law, and that prior to the execution of the agreement the company had not filed in the office of said Secretary of State "the statements, documents or instruments specified in and required by section 9 of said statute" to be there filed.

It appears from a bill of exceptions, certified by the trial judge, that on the hearing on defendants' demurrer the court held that the contract, as set forth in the counts, "is not an investment contract within the Illinois Securities Law."

Counsel for plaintiff here contend that the court erred (1) in holding that said contract is not an investment contract within said Securities Law, (2) in sustaining the demurrer to the counts, and (3) in entering judgment against plaintiff. The main contention of defendants' counsel is that the trial court properly sustained defendants' demurrer because the Illinois Securities Law does not apply to a sale, or a contract for sale, of land, such as is here involved.

The title of said Illinois Securities Law, in force when said contract was executed, is "An Act relating to the sale or other disposition of *securities* and providing penalties for the violation thereof and to repeal Acts in conflict therewith." In section 2 of the act it is provided (Cahill's St. 1923, ch. 32, ¶ 255, p. 916):

"The word 'securities' shall mean and include stock, treasury stock, bonds, debentures, *investment contracts,* notes, evidences of indebtedness, participation certificates, certificates of shares or interest, preorganization certificates and subscriptions, certificates evidencing shares of or interest in trust estates or associations, profit sharing agreements or certificates; or *any* certificate, *contract* or instrument whatsoever, representing or constituting evidence of, or secured by, title to or interest in, or any lien or charge upon, the capital or *any property* or assets of the issuer thereof, and any oil, gas or mining lease, and interests, units or shares in any such lease or leases."

In 37 Corpus Juris p. 275 it is said:

"The term 'securities,' as used in these laws (Blue Sky Laws), means written assurances for the return or payment of money, except where special definitions are given by the statutes. . . . It means the investment of funds in a designated portion of the assets and capital of a concern, *with a view of receiving a profit* through the efforts of others than the investor; and in this sense includes what are termed 'security' or 'investment' contracts or 'speculative securities'." (See *State v. Whiteaker,* 118 Ore. 656, 660.)

As to the term "investment contract," which appears in said section 2 of the Illinois Act, it is said in State v. Gopher Tire & Rubber Co., 146 Minn. 52, 56:

"No case has been called to our attention defining the term 'investment contract.' The placing of capital or laying out of money in a way intended to secure in-

come *or profit* from its employment is an investment as that word is commonly used and understood."

In *State v. Evans,* 154 Minn. 95, 101, it is said:

"The term 'securities' is a more inclusive term than 'investment contracts.' It means 'evidences of debt or *of property,*' and includes all evidences of investment calling for a return in the form of income *or profit."*

In section 3 of the Illinois Act it is provided:

"For the purposes of this Act securities are divided into four classes, as follows:

"(1)  Securities, the inherent qualities of which assure their sale and disposition without the perpetration of fraud, which shall be known as securities in Class 'A';

"(2)  Securities, the inherent qualities of which, or in the nature of one or both parties to the sale thereof, assure their sale and disposition without the perpetration of fraud, which shall be known as securities in Class 'B';

"(3)  Securities based on established income, which shall be known as securities in Class 'C';

"(4)  Securities based on prospective income, which shall be known as securities in Class 'D'."

In section 6 of the act it is stated what securities are comprised in class "C", and in section 8 it is stated that "all securities other than those falling within Class 'A', 'B', and 'C', respectively, shall be known as securities in Class 'D'." In section 7 are stated the regulations and requirements under and by which securities of class "C" may be sold or offered for sale, which include the filing of certain statements and instruments in the office of the Secretary of State of Illinois, and in section 9 are stated what statements and documents must be filed in said office before any security of Class "D" shall be sold, or offered for sale,

In section 37 of the act it is provided (Cahill's St. 1923, ch. 32, ¶ 290, p. 926):

"(1) Every sale and contract of sale made in violation of any of the provisions, of this Act shall be void at the election of the purchaser, and the seller of the *securities* so sold, the officers and directors of the seller, and each and every solicitor, agent or broker of or for such seller, who shall have knowingly performed any act or in any way furthered such sale, shall be jointly and severally liable, in an action at law or in equity, upon tender to the seller or in court of the securities sold, to the purchaser for the amount paid, the consideration given or the value thereof, together with his reasonable attorney's fees in any action brought for such recovery." . . .

We are of the opinion (contrary to the holding of the trial court) that the contract in question should be considered as an "investment contract," and also as a "security" as defined in section 2 of the Illinois Securities Act. By the terms of the contract the company is to convey the land described to plaintiff on receipt by it of $8,000, one third of which sum ($2,666.66) plaintiff is to pay in cash. He does not promise to pay the balance ($5,333.34) at any time out of his own funds, and, indeed, there is no provision allowing him to pay any part thereof out of his own funds. Said balance can only be paid as provided "in the rider attached hereto," and from the rider it appears that "the company agrees *during the calendar years 1925 and 1926* to break, seed, cut and thresh and pay for all labor without cost to the purchasers,"— using a certain mentioned alfalfa seed, and that *"the Company* shall harvest *all* crops upon said land *during the life of this agreement* and the *net profits therefrom* shall be applied to the purchase price of the land and interest." What the life of the agreement may be depends upon the net profit from said crops in the first and succeeding years. In the meantime plaintiff is to be charged interest at 5 per cent per annum on said

balance or whatever part thereof remains from time to time unpaid, and is also to pay all taxes, etc., levied upon the land, and also the expense of hail insurance. It was presumably in the minds of both parties that plaintiff was to ultimately get good title to the land, possibly worth $8,000, upon his making the initial payment of one-third of that amount and other payments for interest, taxes, hail insurance, etc.,—the other two-thirds of said amount to be realized from the crops raised upon the land under the sole control of the company. The contract discloses a highly speculative investment, or gamble, on plaintiff's part. If the crops for the years 1925 and 1926 should be sufficiently large to pay or liquidate said balance of $5,333.34, accrued interest, taxes, etc., plaintiff would presumably make a large profit, but if the crops should be small or unprofitable in the years 1925 and 1926 and in the succeeding years, it is apparent that it would be to plaintiff's financial advantage to cease planting any crops and to cease paying the taxes, etc., in which event the company could forfeit the contract, and plaintiff would lose said initial payment and all subsequent disbursements.

As to the contention of defendants' counsel (that defendants' demurrer was properly sustained because the Illinois Securities Law is not applicable to a contract for the sale of land such as the present one), no case is cited by them in support of the contention. By section 2 of the Illinois Act (above set forth) the word "securities" means and includes not only "investment contracts," but also "any certificate, *contract* or instrument whatsoever, representing or constituting evidence of, or secured by, title to *or interest in,* . . . the capital or *any property* or assets of the issuer thereof." And we are of the opinion that the language of this section is sufficiently broad so as to include as a "security" the contract in question, and, it being ad-

mitted by the demurrer that the company had not complied with the provisions of sections 7 and 9 of the Act relative to the filing of statements and documents in the office of the Secretary of State, we think, in view of the further provision in section 37 (above set forth) of the Act, that the court erred in sustaining the demurrer. In other States there are a few decisions, under similar "Blue Sky Laws," which may be referred to.

In *State v. Evans,* 154 Minn. 95, defendants were indicted, charged with the crime of selling an "investment contract" without a license. Their demurrer to the indictment was overruled by the district court and on certification to the Supreme Court the action of the district court was affirmed. The Minnesota statute made it an offense for any person to "sell or offer for sale any of the stocks, bonds, *investment contracts* or *other securities* . . . issued by an investment company" (except certain securities specifically exempted) without a license from the State Securities Commission. The indictment alleged that the U. S. I. Realty Company, incorporated in Minnesota, was engaged in the business of selling investment contracts issued by it, and that on June 6, 1921, without a license, defendants sold to one Clary an investment contract which had been issued by the company. The contract was set out in full in the indictment, and by its terms the company, in consideration of the payment of a contract fee of $25 and "of the covenants and agreements herein contained," agreed to sell to Clary certain land in the state of Texas for $2,500, payable in monthly instalments of $25 each. The Minnesota court, in commenting upon the contract, said (p. 97): "There is no express obligation on the part of Clary to pay or to buy. There are none of the usual provisions for furnishing an abstract of title or for examination of title." In these particulars it is similar to the present contract, in which, as above shown, plaintiff was not *re-*

*quired* to pay said balance of $5,333.34, but the same was only to be paid out of the net profits from the crops of the land, which during the life of the contract the company only was to harvest. The Minnesota court, after further commenting upon certain options, privileges and conditions contained in the printed portions of the contract, further said (p. 100): "We are of the opinion that this contract is an investment contract within the statute." This decision is cited with approval in the case of *Vercellini v. U. S. I. Realty Co.*, 158 Minn. 72, where it was decided that the purchaser of an investment contract issued and sold in violation of the "Blue Sky Law" is not in *pari delicto* with the seller and may recover from him all the money he paid under the contract,—the court saying (p. 74): "Blue Sky laws are intended to *protect* one class of individuals from the imposition of another class. The only guilty party is the seller of a security sold in violation of the statute." (See, also, *Webster v. U. S. I. Realty Co.*, 170 Minn. 360, 362.)

In *Kerst v. Nelson,* 171 Minn. 191, complainants, doing business in Minnesota as a land company, filed a bill in the district court of Hennepin county to restrain defendants, certain State officials, from interfering with the making of certain investment contracts as to land located in Riverside county, California, which contracts defendants claimed were in violation of the "Blue Sky Law" of Minnesota. The demurrer of the defendants to the bill was sustained by the district court and on appeal to the Supreme Court the order was affirmed. Complainants alleged that they were selling the California land, which they owned or in which they had an interest; that the land was to be used as a vineyard, and that they had a contract with Rogers and company for its cultivation, which contract was assignable in whole or in part to purchasers; that complainants intended to cause Rogers and Com-

pany to execute new contracts with purchasers; that defendants had informed complainants that they could not make such sales in Minnesota without complying with the requirements of the Blue Sky Law, and had threatened to prosecute them; and that defendants should perpetually be enjoined, etc. The form of contract (made a part of the bill) to be issued to purchasers provided that the buyer should be entitled to the use and possession of the land, subject to certain reservations and restrictions mentioned, and that if the buyer elected to take possession, the seller was to continue to cultivate the vineyard and harvest and market the crops upon the same terms and conditions as if the buyer had not taken possession. A trustee was named to receive and disburse money collected for the crops produced, and they were to be marketed in such manner and at such prices as the seller in his discretion should deem advisable. After deducting the cost of delivering and collecting, the balance was "to be divided one-half to the seller and one-half to the buyer." If the fund was not sufficient to cover the expenses, the deficit should be made up by the seller provided the buyer was not in default. During the life of the contract, the seller's agricultural experts should have the exclusive control and management of planting, cultivating and caring for the land, and after the termination of the contract, should the buyer so elect, the seller would continue to cultivate, harvest and market the crops for an additional period of time upon such terms as might mutually be agreed. It was further provided that the contract could not be assigned without the written consent of the seller. It will be noticed that the contract is similar in its provisions to those mentioned in the rider of the contract now in question, as regards the control by the seller of the harvesting and marketing of the crops and the inability of the buyer to assign the contract without the

seller's written consent. It was contended in the Minnesota court, as also here in substance contended, that the contract was "nothing more nor less than one for the sale of land and hence not within the purview of the Blue Sky Law." But the Minnesota court (citing the *Evans* case, 154 Minn. 95, and *State v. Agey*, 171 N. C. 831 and other authorities) disagreed with the contention, saying (p. 195) "in our own decisions we have said that the purpose of the statute is to prevent offers to the public of investment contracts evidencing a right to participate in the proceeds of a venture before the securities commission ascertains where there is something tangible behind it. This is such a venture and should pass inspection by the commission before the public is solicited to invest money in the contract appellants propose to sell." In discussing the further contention of complainants (also made by defendants in the present case) that Blue Sky Laws being penal in their nature should be strictly construed, the Minnesota court held in effect that such laws, considering the evil to be remedied, should not be given a narrow construction, saying (p. 195):

"In view of the ingenuity of those who seek to induce men and women to put their money into far-off speculative enterprises over which the investor has little or no control, and in view of the paternalistic character of blue sky laws, it should be the policy of the courts to refrain from hampering the State officials in the performance of their duties by placing a narrow construction on such laws. This enterprise is within the spirit of the law as well as the letter, and we hold that appellants had no right to injunctive relief."

In *State v. Agey*, 171 N. C. 831, defendant, an agent of a Tennessee corporation which had purchased large tracts of land in Tatnall county Georgia, was engaged in North Carolina in making sales of small portions of the land under written contracts signed by numerous

purchasers. He was indicted and convicted for violation of the "Blue Sky Law" of North Carolina, it appearing that the company had not been licensed, etc. in that State. On appeal the conviction was affirmed. One of the questions raised in the Supreme Court was whether the making of the contracts for the sales came within the purview of the statute, and that question after a lengthy discussion was decided in the affirmative. The statute forbade the sale or negotiation in the State without a license of any bonds, stock, investment contracts, "evidences of property," etc., of a foreign corporation. The contract made with a purchaser provided that the company would sell to him a tract of land of about one and one-fourth acres for a fig orchard for $600—$120 to be paid down in cash and the balance over a term of years, and that the company would set out certain fig cuttings and cultivate, prune and take care of the bushes for 5 years, with a certain indefinite guarantee as to the quantity of the bushes at the end of the period. Title in the tract was to remain in the company until the purchase money was fully paid. At the close of the court's opinion it is said (p. 836):

"Whether the scheme under which the defendant was acting offers any probability of realizing the promises made for the Company, or whether there is any *bona fides*, the outline which has been given does not give much assurance. But, however this may be, the State has a right to require that when such propositions are offered to our people there shall be an investigation as to the reliability of the company, the character of its promoters and managers, and the nature of its business and the amount of its assets, and that it shall not offer its stock, its investments, its 'evidences of property,' until the Insurance Commissioner has examined into its reliability and assets and issued license to such company to do business in this State. The company which the defendant purports to represent has not done this, and he has been properly found guilty."

In the recent case of *Dobal v. Guardian Finance Corp.*, 251 Ill. App. 220, decided by the first division of the Appellate Court of this district, plaintiff sued defendants to recover back certain sums of money paid by her to them under the terms of a certain agreement concerning the purchase of certain junior mortgage bonds secured on real estate in Illinois. On the theory that there had been violations of the Illinois Securities Act the trial court instructed the jury to return a verdict in her favor for $1,475, and entered judgment in that amount against defendants. In affirming the judgment the court held (p. 224) that "the agreement was in the nature of an investment contract and subject to the provisions of the Illinois Securities Act" and (p. 226) that "plaintiff's right of property was in her investment contract and not in the bonds."

In view of the allegations in plaintiff's special counts, the provisions of the contract between the parties and the holdings and decisions above outlined, our conclusion is that the superior court erred in sustaining defendants' demurrer to said counts and in entering the judgment appealed from. Accordingly the judgment is reversed and the cause remanded.

*Reversed and remanded.*

BARNES, P. J., and SCANLAN, J., concur.