In re Estate of Edith R. McCormick, Deceased.
Louis S. Adam and Peter Demetry, Appellants, v.
Chicago Title and Trust Company, Appellee.

Gen. No. 38,314.

Opinion
filed April 7, 1936.

G. E. BEERLY and EDWARD H. S. MARTIN, both of Chicago, for appellants.

CUTTING, MOORE & SIDLEY, of Chicago, for appellee; MERRITT C. BRAGDON and HOWARD NEITZERT, both of Chicago, of counsel.

MR. JUSTICE FRIEND delivered the opinion of the court.

Louis S. Adams and Peter Demetry, plaintiffs, the latter being assignee of one John Ponis, seek to re-

cover payments made under a certain instalment real estate contract alleged to have been executed May 29, 1926, in violation of the Illinois Securities Law (Illinois Revised Statutes, Cahill, 1925, ch. 32, ¶ 254 *et seq.*). Both the probate court, and the circuit court on appeal from the probate court, disallowed the claim, and this appeal followed.

Two questions are presented for determination:

(1) Whether an instalment real estate contract in the usual form, for the sale of a specific lot or parcel of land in decedent's subdivision, constitutes the sale of a security of Class "D" under the Illinois Securities Law, the seller having failed to comply with any of the requirements of the law relating to the sale and offering for sale of a security or investment contract, and

(2) Assuming that the transaction comes within the terms of the Illinois Securities Law, whether plaintiff's action is barred by section 40 of that law, which provides that all civil actions to recover money or for other purposes under the securities law, or based upon any of the provisions thereof, must be commenced within five years after the commission of the act complained of.

The contract in question is not essentially different from the ordinary instalment contract for the sale of real estate. The purchaser agrees to pay for the lot described therein a certain specified sum, part thereof on the execution of the contract and the remainder in monthly instalments of a designated amount, or more, each payable on or before a certain day in each and every month until the entire amount is paid. The vendors agree that if the purchaser shall perform all the agreements provided to be performed by him, the vendors will cause to be conveyed to the purchaser by a trustee's deed all the right, title and interest of Chicago Title & Trust Company, as trustee, in and to

the specific parcel of land therein described. The purchaser thus had the right, at his option, to pay up the entire balance of the purchase price at any time and thereupon secure a deed to the property. The agreement further provides for certain specific restrictions on the use of the property, including the kind of trade or business to be conducted thereon, the nature, height and use of any building to be erected on the property, the materials of which it shall be constructed, and restrictions relating to the keeping of livestock on the premises. The contract further provides that the vendors will install certain public improvements without expense to the purchaser, including sewers, water and gas mains, pavements and sidewalks, and to plant trees and shrubbery in the public parks and streets of the subdivision. The agreement expressly provides that the vendors do not agree to resell the property for the purchaser. It is thus a simple contract for the sale of a specified parcel of real estate on the instalment plan, containing the usual provisions of such contracts for the purchase and sale of lots in subdivided territory and containing the usual restrictions and provisions employed in agreements of that character.

Plaintiffs' counsel state that there are conflicting decisions by the second and third divisions of the Appellate Court for this district upon the question whether the transaction and contract on which the claim is based comes within the provisions of the Illinois Securities Law, and they rely solely on *Prohaska v. Hemmer-Miller Development Co.*, 256 Ill. App. 331, which they say is at variance with *McCormick v. Shively*, 267 Ill. App. 99. In the *Prohaska* case the contract provided for the sale of certain real estate in South Dakota, under which the purchaser had agreed to pay $8,000, one-third in cash and the balance as thereinafter provided in the rider attached

to the contract, and to pay all taxes and assessments levied on the land. The attached rider provided that the vendor should harvest all crops upon the land during the life of the contract, and that the net profits therefrom should be applied to the purchase price of the land. The vendor also agreed, during the years 1925 and 1926, to break, seed, cut and thresh, and pay for all labor. The court held the contract subject to the Blue Sky Law, pointing out that the purchaser could not pay the balance of the purchase price out of his own funds but only out of the net profits of the activities of the vendor in raising and harvesting crops of alfalfa on the land, and that the contract was thus a highly speculative investment or gamble on the part of the purchaser. Since plaintiffs rely principally upon this decision, we quote therefrom at length, as follows (p. 338):

''By the terms of the contract the company is to convey the land described to plaintiff on receipt by it of $8,000, one-third of which sum ($2,666.66) plaintiff is to pay in cash. He does not promise to pay the balance ($5,333.34) at any time out of his own funds, and, indeed, there is no provision allowing him to pay any part thereof out of his own funds. Said balance can only be paid as provided 'in the rider attached hereto,' and from the rider it appears that 'the company agrees during the calendar years 1925 and 1926 to break, seed, cut and thresh and pay for all labor without cost to the purchasers,'—using a certain mentioned alfalfa seed, and that 'the Company shall harvest all crops upon said land during the life of this agreement and the net profits therefrom shall be applied to the purchase price of the land and interest.' What the life of the agreement may be depends upon the net profits from said crops in the first and succeeding years. In the meantime plaintiff is to be charged interest at 5% per annum on said

balance or whatever part thereof remains from time to time unpaid, and is also to pay all taxes, etc., levied upon the land; and also the expense of hail insurance. . . . The contract discloses a highly speculative investment, or gamble, on plaintiff's part. If the crops for the years 1925 and 1926 should be sufficiently large to pay or liquidate said balance of $5,333.34, accrued interest, taxes, etc., plaintiff would presumably make a large profit, but if the crops should be small or unprofitable in the years 1925 and 1926 and in the succeeding years, it is apparent that it would be to plaintiff's financial advantage to cease planting any crops and to cease paying the taxes, etc., in which event the company could forfeit the contract, and plaintiff would lose said initial payment and all subsequent disbursements.''

In the *Prohaska* case the court cites several Minnesota decisions and one from North Carolina to sustain its conclusion. In *State v. Evans,* 154 Minn. 95, defendants were indicted and charged with the crime of selling an ''investment contract'' without a license. The contract was set forth in full in the indictment, and by its terms defendant agreed to sell certain lands in the State of Texas for $2,500, payable in monthly instalments. The court, in commenting on the agreement, said that there was no express obligation on the part of the purchaser to pay or to buy, and that the contract contained none of the usual provisions for furnishing an abstract of title or for examination of title; that the agreement in these particulars was similar to the contract in the *Prohaska* case, under which plaintiff was not required to pay the balance of $5,333.34, but that the same was payable only out of the net profits from the crops of the land which during the life of the contract the company was to harvest.

In *Kerst v. Nelson,* 171 Minn. 191, the agreement provided that the purchaser should be entitled to the

use and possession of the land subject to certain reservations and restrictions mentioned, and that if the buyer elected to take possession the seller was to continue cultivating the vineyard and harvest and market the crops, upon the same terms and conditions as if the buyer had not taken possession. A trustee was named to receive and disburse money collected for the crops produced, and they were to be marketed in such manner and at such prices as the seller in his discretion should deem advisable. After deducting the cost of delivering and collecting, balance was to be divided one-half to the seller and one-half to the buyer, and if the fund was not sufficient to cover the expenses the deficit should be made up by the seller provided the buyer was not in default. During the life of the contract the seller's agricultural experts should have the exclusive control of managing, planting, cultivating and caring for the land, and after the termination of the contract, should the buyer so elect, the seller would continue to cultivate, harvest and market the crops for an additional period of time upon such terms as might mutually be agreed. The Appellate Court in the *Prohaska* case said that the provisions in the Minnesota contract were similar to those enumerated in the Prohaska proceeding with reference to the control by the seller of the harvesting and marketing of crops and the restriction upon the buyer to assign the contract without the seller's consent. It was contended in the Minnesota case that "the contract was nothing more nor less than one for the sale of land, and hence not within the purview of the Blue Sky Law," but the Minnesota court differentiated ordinary real estate contracts from the transaction there involved by saying (p. 195):

"In our own decisions we have said that the purpose of the statute is to prevent offers to the public of investment contracts evidencing a right to partici-

pate in the proceeds of a venture before the securities commission ascertains whether there is something tangible behind it. This is such a venture and should pass inspection by the commission before the public is solicited to invest money in the contracts appellants propose to sell. . . .

"In view of the ingenuity of those who seek to induce men and women to put their money into far-off speculative enterprises over which the investor has little or no control, and in view of the paternalistic character of Blue Sky Laws, it should be the policy of the courts to refrain from hampering the State officials in the performance of their duties by placing a narrow construction on such laws. This enterprise is within the spirit of the law as well as the letter, and we hold that appellants had no right to injunctive relief."

In *State v. Agey,* 171 N. C. 831, on which comment is also made in the *Prohaska* case, an agent of a Tennessee corporation which had purchased large tracts of land in Georgia was engaged in North Carolina in making sales of small portions of the land under written contracts signed by numerous purchasers, and was indicted for violation of the Blue Sky Law of North Carolina, the company not having been licensed in that State. One of the questions raised was whether the making of the contracts came within the purview of the statute, and after a lengthy discussion that question was decided in the affirmative. The contracts made with purchasers provided that the company would sell them a tract of land for a fig orchard and the company would set out certain fig cuttings and cultivate, prune and take care of the bushes for five years, with certain indefinite guarantees as to the quality of the bushes at the end of that period. Title in the tract was to remain in the company until the purchase money was fully paid. The North Carolina

court commented on the transaction, as follows (p. 836):

"The State has a right to require that when such propositions are offered to our people there shall be an investigation as to the reliability of the company, the character of its promoters and managers, and the nature of its business and the amount of its assets, and that it shall not offer its stock, its investments, its 'evidence of property,' until the Insurance Commissioner has examined into its reliability and assets and issued license to such company to do business in this State."

In the *Prohaska* case the court quoted with approval the definition of the word "securities," as taken from 37 Corpus Juris, p. 275, as follows:

"The term 'securities,' as used in these laws (Blue Sky Laws), means written assurances for the return or payment of money, except where special definitions are given by the statutes. . . . It means the investment of funds in a designated portion of the assets and capital of a concern, with a view of receiving a profit through the efforts of others than the investor; and in this sense includes what are termed 'security' or 'investment' contracts or 'speculative securities.'"

The decision which plaintiffs' counsel says is in conflict with the *Prohaska* case is *McCormick v. Shively*, 267 Ill. App. 99, decided in 1932. The contract there involved was held not subject to the Blue Sky Law. It provided for the sale of certain real estate in Mexico upon specified term payments at definite periods of time and the giving of a deed upon final payment. The agreement contained a reservation to the effect that after the payments had been made, and the deed given, the vendor should have for a period of 15 years a one-half interest in all growing crops, timber, oil, gas mines and materials on or under the property. A power of attorney attached to the contract granted to the vendor the right for a period of 18 months to

explore, drill and mine the property and to do certain other things in connection with its use, all at the vendor's expense. The court pointed out that there was no definite agreement or understanding that the vendor *should* develop the property, and that it was merely given the *right* to do so at its election, and, in distinguishing that decision from the *Prohaska* case, said (p. 104):

"In the case of *Prohaska v. Hemmer-Miller Development Co.*, 256 Ill. App. 331, it appears that the vendor under the contract agreed to do certain things, among which was the harvesting of the crops upon the land during the life of the agreement and an application of the profits to the purchase price of the land. There is no obligation in the case at bar on the part of the vendor to do anything other than to deliver a deed upon the payment of the purchase price."

The difference between the contracts in the *Prohaska* case and the *McCormick v. Shively* case, *supra,* is thus clearly pointed out in the last sentence of the foregoing quotation, and we think there is no conflict whatever between the cases, but on the contrary they are in entire harmony. In the *Prohaska* case the agreement was held to be within the Illinois Securities Law because it was highly speculative and included a profit sharing venture, while in the *McCormick* case the opposite result was reached because the vendor merely had the option but was not *required* to conduct a profit sharing enterprise. The same test was applied in both cases.

Plaintiffs seek to distinguish the *McCormick* case by arguing that the court was there dealing solely with the definition of the term "investment contract," and not with the meaning of the word "security," within the purview of the Blue Sky Law. In this contention they are evidently in error, however, for in the opening paragraph of the court's opinion in the *McCormick* case it was said that plaintiff brought her

action "claiming that the defendant had sold her a certain investment contract, which was one of the class of securities enumerated in the Illinois Securities Law, . . . and that the defendant had not complied with any of the requirements of said law relating to the sale and the offering for sale of such a security or investment contract."

Blue Sky Laws now in force in most of the States have been frequently designated as paternalistic in their nature, and, as said in *Stewart v. Brady*, 300 Ill. 425, which held the Illinois Securities Law constitutional, "the clearly indicated purpose of the legislature was to protect the public from deceit and prevent fraud in the sale and disposition of stocks, bonds and other securities within the State."

In *State v. Ogden*, 154 Minn. 425, it was contended that defendant did not violate the Securities Act because he had only sold real estate, but the court found that he was really selling securities instead of real estate, and designated the purpose of Blue Sky legislation by saying, "The paternalistic purpose of the statute is to prevent offering to the public, not land contracts, but investment contracts, evidencing a right to participate in the proceeds of a venture."

In *Creasy Corp. v. Enz Bros. Co.*, 177 Wis. 49, the purpose of the Blue Sky Law was stated in the following apt language (p. 53):

"It may be argued that in one sense every contract is a security, because it guarantees to the parties thereto something of value. But as before stated, the Blue Sky Law was enacted for the purpose of protecting against the sale of worthless money obligations and not against entering into other contracts where service is to be rendered, as here, or other obligations are incurred that do not partake of the sale of securities, or of a sharing in either the capital or profits of a company."

There is nothing in the contract before us to indicate that the purchaser had in any sense invested in an enterprise analogous to those considered in the cases hereinbefore cited. Within the terms of the agreement plaintiffs could at any time pay the balance of the purchase price and receive title to the specific parcel of land purchased. At all times after the execution of the contract they had the right to acquire and own the specific real estate, and nothing more, and the subsequent proceeds of that property belonged to them. They had no interest whatever in any of the other lots in the subdivision or in any property belonging to the vendors or the proceeds thereof. No cases are cited bringing the ordinary real estate contract within the scope of the Securities Law. Sales of real estate have at all times constituted an important part of the total business transactions of this and other communities, and if the legislature had desired to include ordinary sales of real estate in the Illinois Securities Law it would have been a simple matter for them to have done so. Since such contracts are not specifically included in the Act, we must conclude that it was not the intention of the legislature to make them subject to Blue Sky legislation.

In view of our conclusion that the agreement between plaintiffs and decedent and her associates does not come within the purview of the Illinois Securities Law, it is unnecessary to discuss or determine whether, under section 40 of the Illinois Securities Act, plaintiffs' action is barred.

Therefore, for the reasons stated herein, the order of the circuit court disallowing plaintiffs' claim is affirmed.

*Affirmed,*

SCANLAN, P. J., and SULLIVAN, J., concur.