SECURITIES & EXCHANGE COMMISSION v. BAILEY et al.

Nos. 38, 39.

District Court, S. D. Florida, Jacksonville Division.

Oct. 31, 1941.

648

Chester T. Lane, Mayer U. Newfield, Henry E. Mills, and Nathan M. Cohen, all of Washington, D. C., for plaintiff.

Frank R. Greene, of Ocala, Fla., for defendants.

STRUM, District Judge.

The fundamental question here presented is whether or not the defendants are selling "investment contracts" and hence "securities" as defined by § 2(1) of the Securities Act of 1933, 15 U.S.C.A. 77b(1), in violation of §§ 5(a) and 17(a) of said Act. 15 U.S.C.A. §§ 77e and 77q.

Two consolidated cases are before the court. In one (No. 38), E. R. Bailey's Tungland, Inc., and in the other (No. 39), Ocala Ridge Tung Plantations, Inc., are the owners of large tracts of land in Marion County, Florida, said to be peculiarly suitable for growing tung trees. These companies are engaged in selling these lands to the public in small tracts, usually ten to twenty acres, for development and cultivation in the manner hereinafter described. E. R. Bailey and Walter K. Earl are respectively the directing heads of these two corporations.

These companies carry on extensive advertising campaigns over the country by means of personal contacts, correspondence, illustrated pamphlets and brochures sent through the mails, by newspaper advertising, and in the case of the Earl Company, by radio broadcasts. In the advertising the cultivation of tung trees is portrayed as a means of securing a substantial income on a small investment. It is represented that tung oil is needed in large quantities as a basic raw material extensively used in many industries; that there is no substitute for tung oil, and that the demand is always greatly in excess of the supply; that tung trees can be grown only in limited areas of which defendants' lands are a part, and that young trees can be brought to production in four years or slightly longer. Prospective purchasers are told that they need not devote their own time or efforts to the cultivation of the lands, but that they can enjoy the advantage of having experts plant and cultivate the groves for them, while the purchasers carry on their other ordinary activities at home.

The Earl radio broadcasts are usually opened with a striking statement such as (March 6, 1941): "Florida Liquid Gold is on the air!" * * * You may acquire your own tung oil grove and participate in the returns to be enjoyed under scientific management and care." (April 3, 1941): "Florida Liquid Gold is on the air!" * * * Remember, it is not necessary to grow your own trees. Experts in tung production will plant and care for your trees. * * * But if you desire to live on your land, you can build your home and enjoy

life amongst your trees. This gives you the added advantage of personal contact with the management—a privilege you enjoy with very few investments."

Found in the illustrated literature are many alluring statements, of which the following are typical: (Earl's pamphlet): "A tung grove is the outstanding 'investment' today to insure financial security for future years. Reliable authorities state that they know of no crop today that will pay the returns to be had from a tung oil grove in comparison with the amount invested." * * * (Bailey's pamphlet): "Based on the above schedule, your grove at the end of ten years is paid for, your taxes and operating expenses have been met, you have been allowed $1690.24 which your money would have earned at 4%, and you have an additional money profit of $6189.76. Your ten acre grove is now approaching maturity and should show net earnings of $2985.00 per year, thereby netting 15% on $20,000, which constitutes the value of your holdings for which you have paid $3850.00. This means that your grove should now have a value of $2,000 per acre, although you have only paid $3850.00 for it."

When a purchaser is found, the selling company executes to him an ordinary agreement for deed, or contract of purchase, by which the seller agrees that if the purchaser shall first make the payments therein specified constituting the purchase price, the seller will convey by warranty deed, unincumbered, the lands therein described.

Concurrently with or shortly after the execution of the "sales" contract, a separate "development" contract is executed between the purchaser and a developing company or individual. In the Bailey case, the selling company is "E. R. Bailey's Tungland, Inc.," and the development company is "Tung Grove Development Company, Inc." E. R. Bailey is President and directing head of both companies. Advertising literature is issued jointly by these companies. In the Earl case, the selling company is "Ocala Ridge Tung Plantations, Inc.," of which Walter K. Earl is President and directing head. Development of these lands was formerly carried on by a firm in which Earl was a partner, but now the Earl Company's development activities are entrusted to said E. R. Bailey, from whom Earl purchased part of his land holdings.

In consideration of Earl recommending Bailey, as a developer of the lands sold by Earl, Bailey pays Earl 25% of what he (Bailey) receives on the development contracts. So it will be seen that the "sales" and "development" contracts, though separate in form and execution, are closely allied in practice as well as in personnel.

These development contracts usually run over a period of four years, with option to the purchaser to renew the same with added provisions for harvesting and marketing the tung nuts. Various forms of contracts have been used, but in effect they provide that for a stated and quite substantial sum of money the developer will clear the land, fence, plow and harrow it, and will plant and fertilize a stated number of tung trees to the acre, fertilizing and cultivating them, and replacing those that die, through the four-year period. In some instances, the land between the rows of trees is leased by the purchaser to the developer to raise hay or other soil building or humidifying crops, the purchaser receiving either a stated rental or a share of the proceeds of the crop. The small individual tracts are usually under a common fence surrounding a larger area owned by the defendants, or by other purchasers, and all are cultivated as a common enterprise or "plantation" by the developer. Few, if any, of the individual tracts are separately fenced. Thus in effect a purchaser becomes a unit holder in an extensive development enterprise.

Large numbers of these ten to twenty-acre tracts have been sold by defendants during the past several years, some to Florida residents, but very largely to residents of other States. Almost without exception, the purchasers are not farmers, but are predominantly professional and business people, doctors, school teachers, ministers, accountants, clerks, and the like, who have no knowledge of farming and no intention of moving onto the land to cultivate it, but who are attracted solely by its value as a potential source of income on their investment.

Plaintiff, Securities & Exchange Commission, asserts that these are "investment contracts" and hence a "security" within the statute. Defendants contend they are simply selling and developing a tangible and identifiable commodity, land, ownership and the right to possession of which passes to

650

the purchaser, and that contracts evidencing such activities are not within the Securities Act, hence defendants decline to comply with the registration provisions of the Act.

Solution of the question depends upon the perspective in which defendants' activities are viewed. In their formalistic or purely "bare bones" aspect, these contracts might be regarded, as defendants contend, as merely contracts for the sale and development of lands. If that were all, and the transactions involved only the sale or development of land, as such, these contracts probably would not be regarded as "investment contracts" within the meaning of the Securities Act, for contracts for the sale and purchase of a tangible and identifiable commodity, title to and possession of which passes to the purchaser, are not ordinarily regarded as "investment contracts."

But such a view does not adequately portray the true situation here presented. It exalts form over substance. To consider only the formalistic aspect of these contracts is to lose sight of the background and underlying spirit of these transactions, thus seeing only the skeleton while disregarding the flesh surrounding it.

The Securities Act is remedial in nature, to be liberally construed. It affects, not ordinary land sale contracts, but "investment contracts" which evidence primarily a right to participate in the proceeds of an income-producing venture, membership in which is secured through entrusting an investor's capital to the management of others. In appraising contracts for the purpose of determining the applicability of the statute, courts readily look through the form to discover the real nature of the transaction. Labels affixed by the parties are of little moment. Securities and Exchange Comm. v. Universal Service Ass'n, 7 Cir., 106 F.2d 232; Securities and Exchange Comm. v. Crude Oil Co., 7 Cir., 93 F.2d 844; Securities and Exchange Comm. v. Wickham, D.C., 12 F.Supp. 245.

As contemplated by the Securities Act, "securities" are evidences of obligations to pay money, or of a right to participate in the earnings or distribution of property. Oklahoma-Texas Trust v. Securities and Exchange Comm., 10 Cir., 100 F.2d 888.

An "investment contract," as contemplated by the Act, is one which contemplates the entrusting of money or other capital to another, with the expectation of deriving a profit or income therefrom, to be created through the efforts of other persons. Otherwise stated, it is a contract providing for the investment or laying out of capital in a way intended to secure income or profit from its employment, which will arise through the activities and management of others than the owner. Securities and Exchange Comm. v. Universal Service Ass'n, 7 Cir., 106 F.2d 232, 237; State of Minnesota v. Evans, 154 Minn. 95, 191 N.W. 425, 27 A.L.R. 1165.

It is significant that these small tracts are rarely purchased by farmers who wish to cultivate them as an individual farming enterprise. The overwhelming percentage of purchasers are persons wholly inexperienced in tung tree cultivation, who live at a great distance from these lands, and who have no intention of occupying the same or cultivating them by their own efforts, but who are attracted thereto solely by the income to be derived through cultivation of the lands by the defendants.

In essence, what the defendants are really offering, and certainly what the average purchaser is really buying is, not land for its intrinsic value, but a producing tung grove as a source of income, without which he would not be interested in purchasing the land. Purchase of the land is merely the conduit by which the investment is accomplished. Instead of a stock certificate evidencing a share in a common ownership of capital assets, these purchasers receive a deed evidencing an ownership in severalty. But the paramount emphasis is always upon the income to accrue, which is the chief, if not the sole, attraction to the purchaser. Separability of ownership does not deprive the transaction of its character as an investment contract. In its ultimate analysis, the formal purchase is a profit-making venture with others, in which there is a complete separation of ownership and management, and in which the owner takes no part, other than investing in the land. Based upon the defendants' representations, the purchaser's expectation is that for a sum of money invested in a small tract of land which the purchaser places in the hands of the defendants for cultivation, along with many similar and contiguous tracts owned by others, he will ultimately

receive an income from the yield produced by defendants' development activities. This is not an ordinary purchase of land, as such. It is an investment for the purpose of producing an income.

Although the investors own a tangible property interest in severalty, the method of cultivation followed by the developers is such that each purchaser is in effect a unit holder in an extensive enterprise carried on by the defendants, in which the expected income, not the land itself, is the attraction. It is no answer to say that the defendants do not definitely promise or assure the purchasers a profit. Such a promise has not been found essential in any of the decisions hereinafter cited. It is enough that, as here, the purpose of the transaction is to produce a profit on invested capital, through the management of others.

True, the purchasers become the fee simple owners of the land, and are entitled to possession. But this right is more colorable than real. Obviously it is not practicable, nor contemplated, that these purchasers living in distant places shall come to Florida and take possession of these small tracts. And if they did, expert cultivation by the defendants is still urged as necessary to successful production.

The court concludes therefore, in harmony with other courts, that these transactions constitute "investment contracts" within the meaning of the Securities Act. Securities and Exchange Comm. v. Tung Corp. of America, D.C., 32 F.Supp. 371; Kerst v. Nelson, 171 Minn. 191, 213 N.W. 904, 54 A.L.R. 495; State v. Evans, 154 Minn. 95, 191 N.W. 425, 27 A.L.R. 1165; State v. Gopher Tire Co., 146 Minn. 52, 177 N.W. 937; State v. Agey, 171 N.C. 831, 88 S.E. 726; Webster v. United States I. Realty Co., 170 Minn. 360, 212 N.W. 806; Prohaska v. Hemmer-Miller Co., 256 Ill. App. 331; In re Waldstein, 160 Misc. 763, 291 N.Y.S. 697; Note, 87 A.L.R. 82.

In principle, the following cases also support this view: Securities and Exchange Comm. v. Crude Oil Co., 7 Cir., 93 F.2d 844; Securities and Exchange Comm. v. Payne, D.C., 35 F.Supp. 873; Securities and Exchange Comm. v. Universal Service Ass'n, 7 Cir., 106 F.2d 232; Securities and Exchange Comm. v. Wickham, D.C., 12 F.Supp. 245; Gracchi v. Friedlander, 93 Cal.App. 770, 270 P. 235. Cf. contra, State v. Hemphill, 142 Fla. 728, 195 So. 915.

In considering the registration requirements of the Act, and the operation of the provisions of Section 5(a), the determinative question is not whether the enterprise is practicable or impracticable, successful or unsuccessful, or whether defendants are performing their contracts. The United States has the power, which it exercises through the Securities Act, to deny the use of instrumentalities of interstate commerce or communication, as well as the use of the mails, to those offering investments to the public, whether these investments be good or bad, until their sponsors have complied with the Act by making the disclosures thereby required in the public interest. Securities and Exchange Comm. v. Crude Oil Co., 7 Cir., 93 F.2d 844.

Preliminary injunction will issue under Section 5(a) of the Act. Whether or not the statements made or omitted by the defendants constitute fraud, within the meaning of Section 17(a), will be reserved for determination upon all the evidence, rather than upon ex parte affidavits.