SECURITIES AND EXCHANGE COMMIS-
SION v. CRUDE OIL CORPORATION
OF AMERICA et al.

No. 6208.

Circuit Court of Appeals, Seventh Circuit.

Nov. 23, 1937.

Leonard L. Cowan, of Chicago, Ill., for appellant Crude Oil Corporation of America.

Glenn W. Stephens, of Madison, Wis., Warren B. Foster, of Ashland, Wis., and A. E. Kilmer, of Madison, Wis., for appellant B. E. Buckman & Co.

Allen E. Throop, Gen. Counsel, and Thomas J. Lynch, Asst. Gen. Counsel, both of Washington, D. C., and Henry Fitts, of Chicago, Ill. (Francis Thornton Greene and Stuart K. Barnes, both of Washington, D.C., of counsel), for appellee.

Before EVANS and MAJOR, Circuit Judges, and LINDLEY, District Judge.

EVANS, Circuit Judge (after stating the facts as above).

While numerous legal propositions are raised and argued in the briefs, there are only two vital and determinative questions before us. (a) Is the instrument denominated a "bill of sale and delivery contract" a "security" or "investment contract," as these terms are used in the Securities Act, or did defendants' contract evidence the sale of a commodity? (b) Is section 5 (a) of the Securities Act, 15 U.S.C.A. § 77e (a), a valid exercise of legislative power as applied to defendants' transactions with their customers?

(a) Was the bill of sale and delivery contract a "security" or an "investment contract" as these terms are used in the Securities Act?

Section 77b (1), Title 15 U.S.C.A. reads as follows:

"The term 'security' means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a 'security,' or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing."

In view of its purpose we can not construe this section narrowly.[1] The Congress

---

[1] Securities & Exchange Commission v. Wickham (D.C.) 12 F.Supp. 245; Kerst v. Nelson, 171 Minn. 191, 213 N.W. 904, 54 A.L.R. 495; Note in 87 A.L.R. 42, 61.

evidently intended to include all interstate transactions which were the legitimate subject of its regulation of sale of securities. Such has been the uniform holding of courts that have construed the act.

The legislation in question followed the enactment of what has generally been called the Blue Sky Laws of the various states, and the ingenuity and fertility of resources of those dealers in securities who deliberately attempted to avoid their application supplied the background of experience against which this legislation was written.

While there are many decisions which involve somewhat kindred transactions and define the contracts as "securities," there is one, other than that of the court below, which dealt with a contract almost similar to the one under consideration. In Securities and Exchange Commission v. Aldrich Blake, Inc., et al., decided by the Supreme Court of the District of Columbia, May 19, 1936,[2] such a contract was held to be a "security." Similar holdings on quite similar contracts wherein avoidance of the state Blue Sky Laws was sought, appear in State v. Ogden, 154 Minn. 425, 191 N.W. 916; People v. McCalla, 63 Cal. App. 783, 220 P. 436.

Contracts of widely varying content which have been held under the state Blue Sky Laws to be "securities" are:

Sale of royalty interests in proceeds of oil wells—O'Connell v. Union Drilling & Petroleum Co., 121 Cal.App. 302, 8 P.2d 867.

Unit in an association operating oil enterprise—Barrett v. Gore, 88 Cal.App. 372, 263 P. 564.

Rabbit contract—Gracchi v. Friedlander, 93 Cal.App. 770, 270 P. 235.

Deed evidencing interest in oil wells—Barnhill v. Young (D.C.) 46 F.2d 804.

Contract for interest in oil well proceeds—Black v. Solano Co., 114 Cal.App. 170, 299 P. 843.

Fractional interest in oil lease—People v. Craven (Cal.App.) 21 P.2d 459; Western Oil & Refining Co. v. Venago Oil Corp., 218 Cal. 733, 24 P.2d 971, 88 A.L.R. 1271.

Memorandum contracts covering interest in mining profits—People v. Reese, 136 Cal.App. 657, 29 P.2d 450.

Agreement to give share in profits from metallurgical discovery—State of Minn. v. Code & Stevens, 178 Minn. 492, 227 N.W. 652.

Sale of interest in invention—State v. Swenson, 172 Minn. 277, 215 N.W. 177, 54 A.L.R. 490.

Unit holders of leasehold of oil lands held investment contracts—State v. Ogden, 154 Minn. 425, 191 N.W. 916.

Units of oil syndicate—State v. Summerland, 150 Minn. 266, 185 N.W. 255.

Development of vineyard contracts—Kerst v. Nelson, 171 Minn. 191, 213 N.W. 904, 54 A.L.R. 495.

If we look to the acts of the parties which accompanied and followed the execution of these contracts and ascertain the true intention of the contracting parties therefrom, strong confirmation of the conclusion which the District Court reached, appears.

Called a "Bill of sale and delivery contract" it recited in the first paragraph a sale of a designated number of barrels of oil, and there is found therein the express provision, "it is intended that actual delivery of such oil is to be made."

If this paragraph were the only provision of the agreement, it would clearly be a bill of sale and evidence the sale of a commodity. It was not, however, all of the contract. The statement "It is intended that actual delivery of such oil is to be made" was false. Far more significant and controlling than the recital is the fact that there was never a single barrel of oil delivered.

As a deed absolute on its face may nevertheless be a mortgage which secures a loan, so here, the denominated bill of sale was by its own terms a contract which was something quite different from a bill of sale. The provisions which appeared in subparagraphs (1) and (2) negative and in fact nullify that provision of the agreement requiring delivery of the oil, which provision appeared in a preceding paragraph. In effect we have a contract where the parties expressly and specifically agree that they are buying and selling oil and that the oil sold is to be delivered by the seller and received by the buyer, followed by provisions in the same agreement which in effect say that the said foregoing agreement shall be ineffectual and the seller is not to deliver the oil to the buyer, but is to sell the same. The buyer is not to re-

---

2 No opinion for publication.

ceive the oil, but is to accept the proceeds of the sales, which proceeds are to be paid monthly and distributed over a maximum period of twenty-five years. Not only do we find provisions to this effect, but the uniform action of the parties bespeaks their intentions.

The speculative feature of the transaction, the lure held out by the seller, was to be found in the possible rise in the price of oil during this twenty-five year period. The language of the prospectus makes this perfectly clear:

"The fact that the known world supply of crude is sufficient for only a short span of years, that a tremendous amount of research work has not recently resulted in the finding of any new major pools leads those in position to know, to believe that crude oil will sell in the near future for prices far above to-day's figures.

"Every one desiring a given monthly income should investigate the regular monthly profit possibilities available through the ownership and sale each month of a given number of barrels of crude oil. Should investigate the simplicity of the purchasing and marketing arrangement available through this corporation and the possibilities of exceptional profits to be made as prices for crude oil advance."

By placing the acts and deeds of the parties against their professions of innocence and good faith, we are better able to reach the correct conclusion.

The burdens imposed upon the so-called purchaser by the contracts in question prevented him from acquiring possession of any oil. It is fair to say that actual delivery of the oil was not only not intended, but was impossible. The purchaser was required to give thirty days' notice before the month during which he desired to exercise his so-called right of delivery. He was required to go to the point of production and provide for the storage of oil in the East Texas oil field and to furnish tankage facilities for the unknown quantity of oil he was to receive. The gallon quantity of this oil was determined solely by the corporation, and no notice to the purchaser of the amount he was to receive in any month was required. The purchaser might be required to furnish a five gallon tank or a thousand gallon receptacle. To construe this contract as a contemplated sale of oil requires us to picture a Wisconsin purchaser making the journey to Texas to secure a monthly quota of oil which would be so small (as small as three barrels) that the cost of obtaining it would be grossly disproportionate to any possible profit. Further reasons for the conclusions reached by the District Court and approved by us require no elaboration.

The title of the contract, to-wit, "Bill of Sale and Delivery Contract," was a misnomer and a deceptive one. It was obviously conceived for the purpose of avoiding any regulatory control by state or Federal governments of a "security" speculative in nature. The seller hoped and intended to deceive the said Boards thereby, and this accounts for the false recital in the forepart of the agreement.

Without further discussion we state our conclusion which is that the District Court correctly held the document was a "security" and not a sale of a commodity and fell within the language of the above-quoted section of the Securities Act.

(b) Is section 5 (a) of the Securities Act of 1933, 15 U.S.C.A. § 77e (a), as amended, valid when applied to defendants' transactions?

Section 5 (a) is as follows:

"Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly— (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell or offer to buy such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale."

The court found and it is not denied that there was no registration with the Securities Commission.

The question presented here has been passed upon by various Circuit Courts of Appeals as well as District Courts. Securities and Exchange Comm. v. Jones (C. C.A.) 79 F.2d 617; Securities and Exchange Comm. v. Jones (C.C.A.) 85 F.2d 17; Newfield v. Ryan (C.C.A.5) 91 F.2d 700, decided July 22, 1937; McMann v. Securities and Exchange Comm. (C.C.A.) 87 F.2d 377, 109 A.L.R. 1445; Coplin v. U. S. (C.C.A.) 88 F.2d 652; Securities and Exchange Comm. v. Wickham (D.C.) 12 F.Supp. 245. They all uphold the validity of the act.

The Supreme Court has on several occasions passed upon the power of Congress to deny the use of the mails to those who are furthering enterprises which it regarded as contrary to public policy.[1] Badders v. U. S., 240 U.S. 391, 36 S.Ct. 367, 60 L.Ed. 706; Hoover v. McChesney (C.C.) 81 F. 472; Ex parte Rapier, 143 U.S. 110, 132, 12 S.Ct. 374, 36 L.Ed. 93.

■ Even where the offense is local and subject only to state prosecution, the power to refuse the mails to those conducting the unlawful intrastate enterprise exists. Kentucky Whip & Collar Co. v. I. C. Ry. Co., 299 U.S. 334, 337, 57 S.Ct. 277, 81 L.Ed. 270; Brooks v. U. S., 267 U.S. 432, 436, 45 S.Ct. 345, 69 L.Ed. 699, 37 A.L.R. 1407; Stephenson v. Binford, 287 U.S. 251, 53 S. Ct. 181, 77 L.Ed. 288, 87 A.L.R. 721; Public Clearing House v. Coyne, 194 U.S. 497, 24 S.Ct. 789, 48 L.Ed. 1092; Lewis Pub. Co. v. Morgan, 229 U.S. 288, 33 S.Ct. 867, 57 L.Ed. 1190.

Defendants rely upon the decision, In re American States Public Service Company (D.C.) 12 F.Supp. 667, where the court held the holding company act unconstitutional. While we are not here confronted by the question which is raised by the Public Utility Holding Company legislation, it is significant that the weight of authority now favors the validity of this Act. Securities and Exchange Commission v. Electric Bond and Share Co. (D.C.) 18 F.Supp. 131, affirmed by the Circuit Court of Appeals for the second circuit, November 8, 1937, 92 F.2d 580; Burco v. Whitworth (C.C.A.) 81 F.2d 721.

■ Confining our attention to the narrower and more precise question, namely, the power of Congress to enact section 5 of the 1933 Securities Act, as amended, 15 U.S.C.A. § 77e, we are satisfied it is a valid exercise of the power by Congress.

■ Reaching this conclusion we adopt the following from Judge Manton's opinion in Electric Bond and Share Co. v. Securities and Exchange Commission, 2 Cir., 92 F.2d 580, 587:

"Nor is the police power within the field of interstate commerce limited to prohibiting the transportation of articles that are themselves harmful. The stolen motor-car involved in the Brooks Case [267 U.S. 432, 45 S.Ct. 345, 69 L.Ed. 699, 37 A.L.R. 1407] was not in itself different from an automobile lawfully acquired. There was nothing harmful or immoral about prison-made goods, governed by the Hawes-Cooper Act (49 U.S.C.A. § 60), involved in Whitfield v. Ohio [297 U.S. 431, 56 S.Ct. 532, 80 L. Ed. 778] supra, or in the oil regulated by the Connally Act, 15 U.S.C.A. § 715 et seq., Griswold v. President, etc., 82 F.2d 922 (C. C.A. 5). In each of these statutes, as in the registration provisions of this Act, it was held, Congress conditioned particular uses of the channels of interstate commerce upon certain safeguards to prevent those uses from being made the instruments of causing evil or harm in a state other than the state of origin, even though the articles or communications transported might not be inherently harmful. The use of the channels of interstate commerce, regulated by Congress, has been an essentially business or commercial use. The courts have never regarded the innocence or harmfulness of the mere physical movement of persons, goods, or communications as determinative of the limits of Congressional power, so long as the activities regulated were genuinely honest in character. The Securities Act of 1933 and the Securities Exchange Act of 1934 [15 U.S.C.A. § 77a et seq. and § 78a et seq.] make it unlawful to use the mails or channels of interstate commerce without complying with regulations prescribed by the Commission in respect of certain transactions in securities. We held this a valid exercise of Congressional power. Jones v. Securities and Exchange Comm., 79 F.2d 617 (C.C.A.2), reversed in 298 U.S. 1, 56 S.Ct. 654, 80 L. Ed. 1015, on other grounds; Coplin v. United States, 88 F.2d 652 (C.C.A.9); Securities and Exchange Comm. v. Torr, 15 F.Supp. 315 (D.C.S.D.N.Y.), reversed 87 F.2d 446 (C.C.A.2), on other grounds."

The decree is affirmed.