SECURITIES AND EXCHANGE COMMISSION v. PAYNE.

District Court, S. D. New York.
Nov. 15, 1940.

874

Chester T. Lane and Christopher M. Jenks, both of Washington, D. C., John H. Kelley, of Hoboken, N. J., and John J. Prendergast, of New York City, for plaintiff.

James G. Mitchell, of New York City, for defendant.

CONGER, District Judge.

This is a motion by the plaintiff for summary judgment pursuant to Rule 56, Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c. The plaintiff instituted the within civil action pursuant to Section 20(b) of the Securities Act of 1933, as amended (48 Stat. 74, 15 U.S.C.A. § 77a et seq.), for an injunction restraining the defendant from further violation of Section 5 (a) of that Act.

The sole question is whether or not the within documents may be considered a "security". There is no question raised here as to the merits or demerits of defendant's business venture. No question of fraud is raised in the papers.

Louis Payne, the defendant herein, entered into an agreement with Frank A. and Thomas P. Garvey on June 15, 1937, whereby he agreed to purchase from the Garveys 50 pairs of live silver foxes at a price of $225 per pair. This agreement provided that the foxes purchased were to remain upon the ranch in the possession of the Garveys; that for a period of five years the latter would ranch and care for the foxes; that Payne would pay the Garveys $50 a year for each pair ranched with them for breeding purposes and $15 a year for each pup-raised from such breeding foxes (after the first year the charge for raising a pup was to be $10); that the foxes were to be identified and a bill of sale covering them and their offspring, and suitable for recording under the laws of the State of Wisconsin would be issued to Payne; that all offspring of the foxes should belong to Payne; that the numbers of the pens containing the foxes would be furnished to him.

Under this agreement the Garveys guaranteed that the foxes purchased by Payne would produce during the year following the date of the agreement an average mini-

mum of three pups a pair and that in the event this average minimum was not produced the Garveys would supply from their own stock a sufficient number of pups to make up this minimum. The agreement further provided that during the year following the date of the agreement the Garveys were to replace all losses of breeding foxes purchased, regardless of the cause of loss; that Payne might in his advertising literature or otherwise refer to the Garvey's ranch as an "Associate Farm or Ranch". While the agreement of June 15, 1937, provided for the purchase of only 50 pairs of foxes, Payne actually purchased 85 pairs of foxes upon the terms contained in that agreement.

Subsequently, on June 15, 1938, and on March 25, 1939, Payne entered into additional written agreements with the Garveys for the purchase of 340 more pairs of foxes at a price of $225 a pair. Under the first of these agreements Payne actually purchased 246 pairs of foxes, and under the second, up to February 29, 1940, he had purchased 89 pairs. These contracts contained the same provisions for the ranching of the foxes, the guaranty of a minimum pup production, and the replacement of losses among the breeding foxes purchased as did the agreement of June 15, 1937. These last agreements gave "the right of the party of the second part (Louis Payne or any individual to whom he may transfer and assign his interest) to take actual delivery and possession of said foxes or any number thereof at any time he may determine."

These agreements also provided for ranching service not only to the second party (Payne) but to any person to whom he may have transferred his ownership of the foxes.

Since on or about July 1, 1937, Payne has been "selling" to the public live silver foxes to be used for breeding purposes at a price of $970 a pair for full silver foxes, and $770 a pair for three-quarter silvers. These are the same foxes which Payne purchased for $225 a pair. Each sale has been evidenced by a bill of sale and a "purchase and ranching agreement." Two types of purchase and ranching agreements have been used by Payne. Both contain the usual terms of purchase and sale. The type of agreement first employed by Payne provided that the foxes purchased from him should be ranched at

the "Louis Payne Associate Ranch" at Lynxville, Wisconsin; that the foxes thus purchased should be included in a designated unit to consist of approximately 20 pairs of foxes; that all of the offspring of the foxes in each unit should be pooled and the proceeds from the sale of such offspring be divided pro rata among the respective purchasers. It was further provided that $50 per annum for the care of the purchaser's foxes should be deducted from his share of the proceeds from the sale of the offspring; and that all losses of adult breeding foxes due to death, theft or escape should be replaced from the offspring of that unit. Although providing that the purchaser could have actual delivery of his foxes upon payment of accrued charges, yet the agreement also provided that Payne should have the exclusive right to sell the pups or the pelts thereof, produced by the foxes purchased thereunder. This type of purchase and ranching agreement was used by Payne in the sale of foxes to the public from approximately July 1, 1937 to the early part of 1938.

Since 1938 Payne has used a different type of purchase and ranching agreement which eliminates the provisions for the pooling of foxes into a designated unit and for the pro rata distribution of the proceeds realized from the sale of the offspring of the pooled foxes. The new agreement provides that the foxes are to be ranched on the "Louis Payne Associate Ranch", at a cost of $50 per pair a year; that Payne will provide tattoo identification for the foxes purchased and furnish the serial number of the pen or pens in which the purchaser's foxes are to be kept; and that the purchaser may have actual delivery of his foxes upon the payment of accrued charges. Under this purchase agreement Payne agrees to sell the offspring or the pelts thereof produced by the purchaser's foxes and to transmit the proceeds of such sale, less ranching charges and the cost of sale and delivery of the offspring or the pelts thereof to the purchaser. However, Payne guarantees that the purchaser's foxes will produce during the year following the date of the agreement a minimum of three pups a pair and that in the event of failure to produce such minimum Payne will supply sufficient pups to make up the minimum, and agrees to replace all losses of breeding foxes due to death, theft or escape.

876

It appears from the pleadings, affidavits and exhibits submitted on this motion that defendant, in the carrying out of his business has used and was using at the times mentioned in the complaint, the U. S. mails and the means and instruments of transportations in interstate commerce.

In his answer defendant admits that he has not filed with the Securities and Exchange Commission the registration statement provided for in the Securities Act of 1933, but does allege that he is not required to file such registration statement, because he is not engaged in the sale of securities within the meaning of the Act.

The above, generally, are the facts presented to me on this motion. Other facts will be further referred to by me as they become pertinent.

The first question to be determined is whether summary judgment may properly be rendered in this case.

Defendant claims, in his brief, that this motion for summary judgment is an effort on the part of the plaintiff to deprive defendant of his property without due process of law in violation of the Fifth Amendment of the Constitution of the United States and that he is entitled to a "fair trial".

■ I think defendant is in error as to the purpose and office of application for summary judgment. The following extract from a recent text book very well answers defendant's argument on this point: "The summary judgment procedure prescribed in Rule 56 (Federal Rules of Civil Procedure) is a procedural device for promptly disposing of actions in which there is no genuine issue as to any material fact. In many cases there is no genuine issue of fact, although such an issue is raised by the formal pleadings. The purpose of Rule 56 is to eliminate a trial in such cases, since a trial is unnecessary and results in delay and expense which may operate to defeat in whole or in part the recovery of a just claim. 'The very object of a motion for summary judgment is to separate what is formal or pretended in denial or averment from what is genuine and substantial, so that only the latter may subject a suitor to the burden of a trial'. To attain this end, the rule permits a party to pierce the allegations of fact in the pleadings and to obtain relief by summary judgment where facts set forth in detail in affidavits, depositions, and admissions on file show that there are no genuine issues

of fact to be tried. The court is authorized to examine evidence, not for the purpose of trying an issue, but to determine whether there is a genuine issue of fact proper for trial. If there is no genuine issue of fact in controversy, the parties are not entitled to a trial and the court, applying the law to the undisputed material facts may render a summary judgment. If there is a genuine issue as to a material fact, the case will go to trial." Moore's Federal Practice, § 56.01, pp. 3174, 3175.

■ The Supreme Court of the United States has held that summary judgment does not infringe the constitutional right of a party to a trial by jury. Fidelity & Deposit Company of Maryland v. United States, 187 U.S. 315, 23 S.Ct. 120, 47 L. Ed. 194.

It seems to me that the rule permitting summary judgment was intended for just such a situation as here presented. There is no genuine issue of any material fact presented to me. I have searched the affidavits submitted by the defendant in opposition to this motion and I find there no controverted question of fact urged to be submitted to the trial court. Defendant in his affidavit points out no specific question of fact which is not before me. Neither is there a denial of any material fact. If there were I could not consider summary judgment.

I do not regard the affidavit of J. L. Merrion, with respect to the so-called feeding contracts, in any way material to the issue here presented. I find no similarity between the two contracts. It is my opinion that the matters set forth in his affidavit could not be testified to by him on a trial of this issue, because of their immateriality.

■ I am satisfied that from the pleadings, the affidavits, and exhibits submitted by the plaintiff, and from the affidavits submitted by the defendant that there is no dispute as to the facts. The dispute is one of law. From the facts as presented by the aforesaid, this Court may and should decide the question presented.

I stated that the affidavits of the defendant raises no issue of fact. This statement should be qualified to this extent: defendant claims that he is not doing business under the form of contract which he used prior to the early part of the year 1938, and that his first contract with the Garveys is not the one now in use. I am satisfied that

this is correct. In deciding this motion, I have come to my decision by assuming it to be a fact that the business of the defendant has been carried on in accordance with the contracts and documents used by him after the early part of 1938.

In passing on this question I am not taking into consideration the so-called failure of the defendant to either admit or deny the alleged statements of fact requested by the plaintiff of the defendant pursuant to Rule 36. Plaintiff claims that because defendant did not specifically either admit or deny, but relied upon his constitutional rights, it is to be presumed that he has admitted them and is bound by such admissions. I am not passing on this point; whether or not he can plead his constitutional privilege is a moot question. It is not necessary for me to pass on it, as I have disregarded this part of the plaintiff's contention and in passing on the legal question herein presented, I have considered only the pleadings, the affidavits and exhibits presented by the plaintiff and the affidavits presented to me by the defendant.

Having decided that the question of summary judgment is proper to be considered by this court, the next question is on the merits, whether or not the purchase and ranching agreements together with the bill of sale by which the defendant Payne purports to sell live foxes to the public, constitutes a security as defined by Section 2(1) of the Securities Act of 1933. This must be decided from the material facts presented to me from the sources hereinbefore referred to.

The first approach to this question should be, first, to examine the section of the Act applicable thereto, and second, to examine the rules the courts have laid down in construing this Act.

In the Act, a "security" is defined as follows: "(1) The term 'security' means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a 'security', or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing."

■■ I have examined many decisions, both State and Federal and find that they uniformly hold that this type of legislation is remedial and should be given a liberal construction; and that in determining whether a particular instrument is a security within the meaning of the Act the substance of the transaction and the relationship between the alleged issuers and alleged security holders will control as against the form of the alleged security.

The case of Securities and Exchange Comm. v. Universal Service Ass'n, 7 Cir., 106 F.2d 232, at page 237, very well sums up the rule of law laid down by the courts: "One of the recognized purposes of the Securities Act is to compel full disclosure of the truth, and the form of arrangements or transactions whether they be styled sales of commodities, agencies, leases, applications, endowments or by any other name must be tested by the rule of substance. It is true that when Congress attaches consequences to form, such as the precise wording of an instrument, or the corporate devise for tax purposes, the courts may not regard substance as controlling. But in this case we are controlled by an act of Congress which is intended to prevent overreaching and to mandate 'fair disclosure'; and the Congressional expressions relating to 'securities' are so broad and all-inclusive that we must recognize that the Congressional intention is to give effect to substance and not to form."

Again, the Circuit Court, in construing this section of the Act, in Securities and Exchange Comm. v. Crude Oil Corp., 7 Cir., 93 F.2d 844, at page 846, made this pertinent observation: "In view of its purpose we can not construe this section narrowly. The Congress evidently intended to include all interstate transactions which were the legitimate subject of its regulation of sale of securities. Such has been the uniform holding of courts that have construed the act.

"The legislation in question followed the enactment of what has generally been called the Blue Sky Laws of the various states, and the ingenuity and fertility of resources of those dealers in securities who deliberately attempted to avoid their application supplied the background of ex-

perience against which this legislation was written."

From the decided cases the courts have taken the view that to determine whether a transaction involved is a "security" the real nature of the transaction is the controlling element. See Securities and Exchange Comm. v. Crude Oil Corp., supra; Securities and Exchange Comm. v. Tung Corp., D.C., 32 F.Supp. 371, and cases therein cited.

■ Viewing the contracts here involved, and the acts and conduct of the parties in the light of the above decisions, and ascertaining the true intent of the contracting parties, I have come to the conclusion that what was designated as a sale of foxes, was nothing more or less than an investment, and so regarded by the contracting parties; and that the contracts between the so-called seller and the so-called buyer were and are securities as defined by the Act.

True the said documents on their face, and judged according to form, appear to be contracts of sale; true the purchaser is given title and the right to possession of the animal or animals mentioned in the contracts; true there are other indicia of ownership, such as marking of the animals for each individual "purchaser", the recording in the proper office of the "bill of sale" in the name of the purchaser and the payment of personal tax on each animal; nevertheless, viewing the various transactions by and large and all the surrounding circumstances one can conclude only that these transactions were investments and not actual and bona fide sales.

As I view it purchasers of the foxes were not hoping by their own efforts to better themselves with the foxes purchased, but for a certain sum of money become part of a business venture in which they were to reap a share in the profits or proceeds. They were investors. The transaction contemplates the conduct of a business enterprise by others than the purchasers, the profits or proceeds of which the purchasers were to share.

Many in this world of ours desire to make money without effort. Men and women in all professions, busy men and women with good incomes, have an inate desire to increase their income or their principal. They do this by so-called investments. They venture into realms of which they know nothing. All the litera-ture of the defendant appeals to this urge. Here was an appealing proposition to an investor. Under skillful handling and care by experienced men, and by the very law of nature, a pair of foxes would produce young each year (at least three). This increment was the profit. Properly handled by a skilled salesman, who had access to the proper markets, this increment would return dollars. All without any effort on the part of the purchasers.

Let me quote from one of the letters defendant sent to prospective customers: "Making money in fur farming is simplicity itself. You buy breeding stock of proven capacity. We place the animals in spacious pens, feed and care for them in a most scientific manner, and when they have bred and puppies are mature we pelt the off-spring and send the furs to markets. In a short time you receive a substantial check for your pelts and the proceeds are usually larger than expected."

Again, I quote from another letter: "The purpose of selling breeders to investors is similar to that of any other well established producing company which employs stock certificates as a means of raising capital for expansion purposes. Also it further enables investors for income to share to a measurable extent in the substantial pelt profits enjoyed by a well managed fur farm."

While the contract of sale does grant the right to the purchaser to take actual delivery of the foxes, it is apparent that the purchasers did not enter into this venture with the idea of taking the foxes. It is most significant that from the very beginning of this business down to the commencement of this action, no purchaser has even asked for actual delivery.

This fact is most significant, as was stated in Securities and Exchange Comm. v. Crude Oil Corp., supra: "the contracts are not made with persons who contemplate taking actual delivery." I hold the same here. The very nature of the animal, the wide extent and distribution of the so-called sales all over the United States to men and women residents of large cities who couldn't even expect to bring the foxes, for instance, to New York, Washington, Baltimore, Chicago, or Charlotte, North Carolina.

These people could not be expected to care for and look after these animals who were naturally of the wilds of the cold

country. They could not and did not expect to breed them, to take care of the female before birth, and to properly deliver the offspring. This is a business in itself.

The fact that a half.pair, or one fox, may be purchased and left on the farm is also significant on this point.

The crux of this proposition is to have the foxes looked after on the fox farm by skilled men; the sale of the young and pelts sent to the market by Payne who knew the markets, who had experience and who could get a better price for the furs because of his experience, and because he sold in large quantities, and because of the further fact that he had a ready market in the ranch owner.

I regard as significant defendant's practice of giving to the purchaser, shortly after entering into purchase and ranching agreements, an amount of money equal to 15% of the purchase price, as an advance against anticipated profits from the sale of the offspring or pelts produced by the foxes. This could have been only in contemplation of the foxes remaining on the fox ranch.

.In the literature employed by the defendant he puts great stress on the elaborate equipment on his associate ranch and the extent of fur-breeding experience of his associates, implying the successful breeding of silver foxes requires equipment and experience which the purchasers could not hope to acquire.

I am satisfied from the picture as presented, to me by the pleadings, affidavits and exhibits that these purchasers of foxes, while they may have owned the foxes, yet took no part and intended to take no part in their breeding, raising or marketing; that they were not buying animals, but the right to profits to be realized through no effort of their own, through an enterprise run by the defendant, part of which earnings they received before there were any earnings, by way of anticipated profits. Such an arrangement involves an investment contract, a security within the meaning of Section 2(1) of the Securities Act of 1933.

These customers are investing their money in a business enterprise to be managed by Payne upon whose efforts, solely, depends an expectation of profits. They have purchased securities, an investment contract evidenced by a purchasing agreement and a bill of sale.

In his answer defendant has raised the question of the constitutionality of the Securities Act of 1933. It is unnecessary for me to go into this question more thoroughly than to refer defendant to the case of Securities and Exchange Comm. v. Crude Oil Corp., supra, and the cases therein cited, in which the constitutionality of Section 5 of the Act was upheld by the Circuit Court of Appeals, Seventh Circuit.

I therefore believe that summary judgment should be granted herein in favor of the plaintiff. Motion granted. Settle order on notice.