**ATHERTON et al. v. UNITED STATES.**

**No. 9828.**

Circuit Court of Appeals, Ninth Circuit.

May 19, 1942.

Bates Booth and Alfred P. Peracca, both of Los Angeles, Cal., for appellants.

Wm. Fleet Palmer, U. S. Atty., and Russell K. Lambeau and Edward H. Law, Asst. U. S. Attys., of Los Angeles, Cal. (Arthur E. Pennekamp, Atty., Securities and Exchange Commission, of San Francisco, Cal., of counsel), for appellee.

Before DENMAN, STEPHENS, and HEALY, Circuit Judges.

HEALY, Circuit Judge.

Appellants, with four others, were indicted on a charge of conspiracy to violate, and of violating, the provisions of § 17 (a) (1) of the Securities Act of 1933, 15 U.S.C.A. § 77q (a) (1), and the mail fraud statute, 18 U.S.C.A. § 338. Each of the appellants was convicted on various of the 17 counts. Of the four others indicted, one, McBride, entered a plea of nolo contendere; and two, Baskette and Finnerty, were convicted but have not appealed. Black, the remaining defendant, was acquitted. The basis of the substantive counts is that the defendants conceived and carried into effect a scheme to defraud through the sale of partial assignments of oil and gas leases and undivided interests in a drill site.

The venture was promoted under the name of Caloma Oil Company, a partnership formed for that purpose by Baskette, McBride, and one Scott. Scott was shortly eliminated from the picture. In 1936 the Caloma Oil Company, at trifling expense,

obtained or revived oil or gas leases on some 2,300 acres of land in Oklahoma in the neighborhood of the producing Fitts Field. Of the area under lease a tract of 160 acres was selected as a drill site upon which it was proposed that a well be drilled for the purpose of proving the area. The plan as conceived and carried out was for the sale of fractional assignments of these leases in minimum lots of 2½ acres each, it being represented that the drilling of the well on the drill site would be financed by these sales. As a first step, a geological report of the area was procured from the defendant Black. Arrangements were then made with a licensed real estate broker to open an office in the Caloma Oil Company's headquarters at Los Angeles and for the placing in that office of licensed salesmen who were to operate on the basis of a 40% commission; and a permit was secured from the Real Estate Commissioner of the State of California for the sale in that state of the fractional interests.

The defendant Finnerty, who, incidentally, was convicted on the conspiracy count only, was a deputy in the office of the Real Estate Commissioner. He actively interested himself in having a favorable report made; also, in having numerous extensions of the permit approved later on. There is evidence that Finnerty's activities were compensated by the Caloma Oil Company. The three appellants served at one period or another as salesmen of the Caloma leases under the brokerage arrangement, they being locally licensed real estate salesmen. Their efforts were instrumental in the making of numerous sales and in the realization therefrom of a large amount of money, little of which was used in the development of the drill site. Work on the supposed test well was sporadic to say the least, drilling being carried on 15 days at one time, 15 at another, and about 60 days at another time during the 3-year period of the selling campaign.

1. Some of the representations charged and proved in connection with the sales were that the leases covered property bearing every indication of oil being found in large quantities; that the "Geological Department" of the Caloma Oil Company, under the supervision of one of the foremost geologists of the Mid-Continent area, had selected the acreage after 2 years of research and prior to the date of the discovery of the Fitts Field; that the formations being encountered in the Caloma Oil Company's well correlated so perfectly with the logs of wells in the Fitts Field that the minds of the promoters were satisfied as to the correctness of their geological researches; that "our acreage has been withdrawn from the general market, as we feel confident that the very near future will see Caloma's holdings brought in as a new producing area"; that appellant Standish was field superintendent for the company, had spent over 25 years in his present work and was thoroughly versed in every department of the oil business; and that the salesmen of the company were so convinced of the desirability of the leases that they had invested their own funds therein. The falsity of these representations was abundantly established. The enterprise was shown to be from first to last a heartless swindle designed to attract, as it did, the small savings of women, old people, and others of the type traditionally preyed upon by the unconscionable sharper.

Appellants concede that the scheme was rankly fraudulent both in inception and in execution. Their claim is that they were ignorant of the fraud, and that as mere licensed salesmen they were entitled to rely on the investigation and report of the Real Estate Commissioner made prior to the issuance of the permit. But unfortunately for appellants the record belies their argument. There is much evidence tending to prove knowledge on their part of the fraudulent nature of the enterprise; and it is clear that they lent themselves willingly to deceitful practices and that they indulged knowingly in gross exaggerations to effect sales. We need not recite the evidence; enough to say that it was sufficient to go to the jury in support of the several counts on which appellants were convicted.

2. During the early part of the trial an incident occurred on which appellants predicate error. While a witness was being examined a question was asked which was objected to as leading. In ruling on the objection the court remarked that "it is as hard to get an answer out of this witness on any question as it was to get oil out of this ground." Counsel for appellants objected to the remark as prejudicial; whereupon the court said "Well, I probably shouldn't have said that, and I will instruct the jury to disregard my remark. I made that on the assumption that they will bring us in some oil before we get through * * *. You will disregard, gentleman,

my remark the same as if it had never been spoken."

It goes without saying that judicial interpolations of this sort have no place in a serious jury trial. On occasion they do much harm and they are never helpful; but we are satisfied that the comment here did not damage appellants' cause. Nobody claimed that the Caloma leasehold had produced any oil; and as already noted, appellants concede that its promoters had no reason to believe that it would produce any. Certainly the remark could not be taken by the jury as an intimation of the court's view that appellants were guilty of an offense.

■ 3. Appellants were paid commissions of 40% to 50% on sales. In examining witnesses who had been canvassed as prospective purchasers, government counsel questioned nearly all of them as to whether the salesman had disclosed the amount of commissions he was to receive. Invariably the answer was in the negative. Appellants say that the court was in error in permitting this persistent line of questioning.

We think differently. One of the inducements held out by appellants to prospective purchasers was that the proceeds of the sale of leases would be used in drilling the test well and that thus the value of the investment would be established. It may be assumed that the failure of appellants to disclose their own very large commissions had no great probative value, particularly as there was evidence that commissions up to 50% were not unusual on projects of this kind. But we think the jury could safely be trusted to keep such negative testimony in its proper perspective. Had appellants disclosed the amount of their commissions, that circumstance would have been a proper item of proof on their behalf for whatever it was worth. The reverse is equally true.

■ 4. The first four counts of the indictment charged a violation of § 17 (a) (1) of the Securities Act of 1933 by the employment of a scheme to defraud in the sale of a security, namely, assignments of oil and gas leases. Appellants demurred to these counts and moved for a directed verdict as to them on the ground that the leases were not a "security" as that term is defined in § 2 (1) of the same Act.[1] Appellants Standish and Atherton were convicted on counts 1 and 3, respectively.

It is made clear in the indictment and in the proof that the purchasers looked entirely to the efforts of the promoters to make their investment a profitable one. The small leased acreage acquired by the individual purchaser was not itself susceptible of economic development, nor was the purchase made with the idea of independent exploitation. The leases were sold at prices ranging from $50 to $200 per acre upon the promise and representation that the proceeds of the sale would be used for bringing a well into production on the drill site, thus proving the productivity of the whole area under lease. It was proposed that when the well was completed the entire acreage, including the area selected as the drilling site, would be sold as one unit, and that each purchaser of an assignment would receive a proportionate share of the purchase price. Clearly, the investor acquired more than a mere lease.

In a similar situation the Securities and Exchange Commission has held that assignments of 5-year term oil and gas leases, in parcels of not less than 5 acres, were "investment contracts"; hence were securities within the definition of the statute. In Re Matter of Natural Resources Corporation, February 14, 1941. In cases where the investor looks to the promoter to determine the success of the investment, it has uniformly been held by the federal courts that unit transactions of this general character involve the sale of a security within the scope of the Securities Act of 1933. Securities and Exchange Commission v. Crude Oil Corporation of America, 7 Cir., 93 F.2d 844; Securities and Exchange Commission v. Pyne, D.C.Mass., 39 F.Supp. 434; Securities and Exchange Commission v. Tung

---

[1] "The term 'security' means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a 'security', or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing." 15 U.S.C.A. § 77b(1).

Corporation of America, D.C.Ill., 32 F. Supp. 371; Securities and Exchange Commission v. Payne, D.C.N.Y., 35 F.Supp. 873; Securities and Exchange Commission v. Bailey, D.C.Fla., 41 F.Supp. 647.

The demurrer and motion were properly denied.

We find no reversible error in the record.

Affirmed.