## SECURITIES AND EXCHANGE COMMISSION v. C. M. JOINER LEASING CORPORATION et al.

No. 10440.

Circuit Court of Appeals, Fifth Circuit.

Feb. 1, 1943.

Writ of Certiorari Granted April 19, 1943.

See 63 S.Ct. 994, 87 L.Ed. ——.

John F. Davis, Solicitor, Securities and Exchange Commission, and Louis Loss, Attorney, Securities and Exchange Commission, both of Philadelphia, Pa., and O. H. Allred and R. F. Milwee, Jr., Attorneys, Securities and Exchange Commission, both of Fort Worth, Tex., for appellant.

D. A. Frank, of Dallas, Tex., for appellees.

Before SIBLEY and HUTCHESON, Circuit Judges, and KENNERLY, District Judge.

KENNERLY, District Judge.

This suit was filed in the District Court February 16, 1942, by appellant, the Securities and Exchange Commission, against appellees, the C. M. Joiner Leasing Corporation (for brevity called Corporation) and C. M. Joiner. John T. Johnson, individually and trading as the Miller Leasing Company, was also sued, but the case as to him was disposed of by agreed decree in favor of appellant.

The suit arises under the Securities Act of 1933, (Title 15, U.S.C.A., Sections 77a to 77aa, 48 Stat. 74). Appellant alleged that Corporation about 1940 became the owner of Oil and Gas Lease or Leases on 3000 acres of land in McCulloch County, Texas, called the "Joiner Paramount Development," and that appellees had been and were, themselves, and through Johnson, their agent, offering, in many parts of the United States, to sell or assign, and were selling and assigning, such lease or

leases on, in and as it or they covered tracts of from 2½ to 20 acres out of the 3000-acre tract, and in doing so were sending through the United States mails false and misleading literature, letters, etc. with respect thereto. Claiming that such sales or assignments involved sales of a "security" as defined by Section 2(1) of the Act, appellant sought, under the provisions of the Act, to enjoin appellees from so doing. The District Judge thought that such sales and assignments did not involve sales of a security, and rendered judgment for appellees. Appellant has appealed and is here complaining of the judgment.

Appellant concedes that the sole question presented by its appeal is whether such sales and assignments involve sales of a security as defined by Section 2(1) of the Act.

The facts are not greatly, if at all, in dispute. The Corporation is engaged in the business of buying and selling oil and gas leases and developing oil and gas properties in Texas. C. M. Joiner is its president and directing head. The other officers are Joiner's wife and a secretary. All of the stock of the Corporation is owned by these officers and one Shuman. About 1940 the Corporation secured the assignment to it of oil and gas lease or leases covering about 3000 acres of land in McCulloch County, Texas. The record does not show the form of the lease or leases, but the parties have treated them as being, and presumably they are, in the form of an ordinary Texas Commercial Mineral Lease carrying an Interest in the land.[1] The assignment to Corporation was from A. L. Anthony, a drilling contractor who had previously blocked up the acreage and acquired the lease or leases thereon. The record does not show the form of such assign-

ment, but it has been treated as being, and presumably is, in the form of the ordinary Texas Commercial Assignments of oil and gas leases, which passes title to an interest in the land. Part of the consideration for the assignment was the obligation of Corporation to drill a well for oil or gas on the 3000 acres of land.

In accordance with such drilling obligation, Corporation contracted with Anthony and Anthony agreed to drill a well to a depth of 2000 feet (unless oil or gas in paying quantities be encountered at a lesser depth) on the 3000 acres, for which Anthony was to be paid at the rate of $2.50 per foot. At the time this contract was made, Corporation did not have sufficient funds to pay for the drilling of the well, but it expected to obtain the necessary funds principally from the sale or assignment of such lease or leases on and as it or they covered small tracts of land out of the 3000 acres and surrounding the well. Anthony drilled the well down to about 1375 feet without striking either oil or gas and abandoned it about December 1941.

The Corporation and Joiner, themselves and through the medium of Johnson, have offered for sale or assignment and sold and assigned such lease or leases on, in and as it or they covered specific tracts varying in size from 2½ to 20 acres out of the 3000 acres, at prices ranging from $5 to $15 an acre. The record shows that up to September 10, 1941, sales and assignments had been made by Corporation, Joiner and Johnson to between 50 and 80 persons scattered over the United States. The form of the assignments by Corporation to Johnson (trading as the Miller Leasing Company) is the ordinary Texas Commercial Assignment of oil and gas leases and is shown by the record.[2] Likewise the form of as-

---

[1] Texas Co. v. Daugherty, 107 Tex. 226, 176 S.W. 717, L.R.A.1917F, 989; Stephens County v. Mid-Kansas Oil & Gas Co., 113 Tex. 160, 254 S.W. 290, 29 A.L.R. 566; Sheffield v. Hogg, 124 Tex. 290, 77 S.W.2d 1021, 1024, 80 S.W.2d 741; Downman v. Texas, 231 U.S. 353, 34 S.Ct. 62, 58 L.Ed. 264.

[2] This form of Assignment is as follows:

"Assignment of Oil and Gas Lease.
No. 62.

"Whereas, on the 12th day of March, 1941, a certain oil and gas mining lease was made and entered into by and between Nat Randals and wife, Lottie Randals, Lessor, and A. L. Anthony, Lessee,

covering the following described land in the County of McCulloch and State of Texas, to-wit: Among other lands (8) 282 acres, more or less, the North one-half of A. M. Waldrip Survey No. 146, Certificate No. 33/3271, Abstract No. 1725, patented to D. C. Randals by Patent No. 556, Vol. No. 18, conveyed by Clay S. Randals and wife to Nat Randals by deed dated September 5th, 1929, recorded in Vol. No. 84, Page 210, Deed Records of McCulloch County, Texas, and containing 1,463.47 acres of land, more or less—Save and Except Art. No. 7, of above described tracts containing 160 acres, being Henry Dulaney Survey No. 1082.

signments from Johnson to purchasers.[3] The form of assignments by Corporation directly to its purchasers is not shown by the record, but are treated as being, and we presume they are, the same as or similar to the form of assignment from Corporation to Johnson. The record also shows the form of application a purchaser was invited to make.[4]

In other words, it is clearly shown that what Corporation was offering for sale and selling and assigning was a leasehold in-

"Said lease being recorded in the office of the County Recorder in and for said County in book No. 102, Page No. 108, and

"Whereas, the said lease and all rights thereunder or incident thereto as assigned herein are now owned by C. M. Joiner Leasing Corporation.

"Now, therefore, for and in consideration of One Dollar (and other good and valuable considerations), the receipt of which is hereby acknowledged, the undersigned, the present owner of the said lease and all rights thereunder or incident thereto, does hereby bargain, sell, transfer, assign and convey all rights, title and interest of the original lessee and present owner in and to said lease and rights thereunder in so far as it covers the following tract of land:

"Being the North-west quarter, containing two and one half acres, more or less, of the South-west quarter of the South-east quarter of the West One hundred Sixty Acres—(NW¼-SW¼-SE¼-W. 160 Ac.) of the West 282 acre tract, of Nat Randals and wife Lottie Randals, being out of the N. one half of the A. M. Waldrip Survey No. 146, Cert. No. 33/3271, Abst. No. 1725, McCulloch County Texas. conveying herein two and one half acres, more or less, together with all personal property used or obtained in connection therewith to Miller Leasing Company and its successors and assigns.

"And for the same consideration, the undersigned for itself, its successors and representatives, does covenant with the said assignee, its successors, or assigns, that C. M. Joiner Leasing Corporation is the lawful owner of the said lease and rights and interests thereunder as herein assigned and of the personal property thereon or used in connection therewith; that the undersigned has good right and authority to sell and convey the same, and that all rentals and royalties due and payable thereunder have been duly paid to date.

"Note: This Lease carries an annual rental of $1.00 per acre payable to the lease rental account of Nat Randals and wife, Lottie Randals, at the Brady National Bank of Brady, Texas, on or before the 12th day of March of each year hereafter during the primary term of said Lease. The primary term of said Lease expires March 12th, 1951.

"In witness whereof, the undersigned has caused this instrument to be signed by its duly authorized officers and its corporate seal affixed hereto this 15th day of May, A. D. 1941."

[3] This form of Assignment is as follows:

"Know all men by these presents, that I, Jno. T. Johnson, operating as Miller Leasing Co., for and in consideration of the sum of One ($1.00) Dollar and other good and valuable considerations, the receipt of which is hereby acknowledged, have this day assigned, transferred, conveyed and sold unto Miss Susie A. Conway, all of my right, title and interest in and to the foregoing oil and gas lease as described and set out in the assignment on the reverse side of this sheet, and the assignee herein hereby accepts same and assumes the payment of the rentals as stipulated therein.

"Dated at Dallas, Texas, this 22nd day of April, A. D. 1941."

[4] This form of Application is as follows:

"Special Location. Application for Purchase. C. M. Joiner's Acreage—Paramount Area. Miller Leasing Company, 1318 Wood Street, Dallas, Texas. Gentlemen:—I have read Mr. Joiner's letter regarding his new development and desire to purchase an Oil and Gas Lease at the special price now being offered by you.

"5-Acres at $15.00 per acre * * * Total Price $75.00.

"Enclosed please find $7.50 as First Payment, balance payable $12.50 per month.

"Acres at $15.00 per acre * * * Total Price $———.

"Enclosed please find $——— as First Payment on Five Acre Lease, balance payable $——— per month.

"Upon final payment, I am to receive a Recordable Oil and Gas Lease, issued in my name, conveying ownership to a Full commercial Oil and Gas Lease on a certain described tract of land. Date ——— Name ——— Address ——— Make all checks or money orders payable to Miller Leasing Co., Dallas, Texas. 10% Discount allowed for all cash payment."

terest in specific tracts out of the 3000 acres, or as defined by Texas courts—an interest in the land of specific tracts out of the 3000 acres.

With respect to the methods and representations used by Corporation, Joiner and Johnson to secure purchasers, the Trial Judge found fraud.[5] We approve his findings—indeed, the evidence would justify stronger findings of fraud.[6] In some instances, leasehold interest in specific tracts were offered before any public announcement had been made as to the location of the "Joiner Paramount Development," the public being invited to purchase leasehold interests in then undescribed and unlocated tracts of land, the details as to location, etc. to be subsequently revealed to purchasers. Even after the location was made public, Corporation and Joiner generally made the selection of the purchasers' tract or tracts of land.

It is a matter of common knowledge that persons engaged in the oil industry in Texas and elsewhere buy, sell, assign and traffic in oil, gas and mineral leases, and particularly those covering land near producing oil or gas wells or wells being drilled. The only thing that differentiates these sales and assignments by Corporation to purchasers from the usual and ordinary sales and assignments between those engaged in the oil industry is the fact that Corporation and Joiner them-

---

[5] We quote from the findings of the Trial Judge:

"The representations made in these circulars and letters which were sent out, both by Joiner and Johnson, were not supported by the facts. They were not denied by some of the facts either, because subsequently and quite recently, in fact, oil has been found in that particular county.

"What they said was not true, that this particular county was in the center of or in the heart of the highest production area in Texas, it was rather remote from it, though contiguous to a shallow and a smaller production.

"Mr. Joiner seems to have kept his contract with Mr. Anthony, the driller, and Anthony, the driller, seems to be the one who was unable to go forward in the manner he had agreed to go forward with Joiner.

"Joiner now has invested more funds in order to eventually satisfy himself as to the productivity or non-productivity of that particular area, and has invested more than he has received.

"All of which I find as facts.

\* \* \* \* \* \*

"I do grant that these promotion schemes are of detriment to the people, no doubt about that. They should be stopped. We have a criminal statute that will stop them. These letters being sent out with a fraudulent intent is a fraudulent use of the mails, it does not make any difference whether there is any interstate use or not, and that interstate feature does not enter into the Securities Act."

[6] One circular letter mailed to the public by Corporation and Joiner is dated August 15, 1941, and is typical of many others. It is addressed to "Dear Friend," and its opening paragraph is: "There is a tide in the affairs of men which if taken at the flood leads on to fortune."

Its closing paragraph is: "In a continuation of our efforts to make you money, if you send in an order for twenty acres around either or both of these wells, after the date of this letter, you will get ten acres Free in the next block of acreage we drill which is most likely to be in Concho County, Texas. You will really be in the oil business."

A form of order for use of purchasers is as follows:

"Application Concho & McCulloch Leases.
    Date: Aug. 16, 1941.
"C. M. Joiner Leasing Corporation,
    "Dallas, Texas.         9
        "Securities and Exchange
        "Commission Received
        "Fort Worth Regional Office.
"Gentlemen: I am taking advantage of your offer of August 15th, and hereby subscribe for —— acres at $5.00 per acre, total of $—— which I enclose herewith. If this order is for twenty acres it is understood that I am to receive Free ten acres in the next block of leases you drill.
    Name ——  Adress ——."

A map mailed to the public showed McCulloch County and Counties to the north, with indications of heavy oil and gas production, with this statement at the bottom of the map:

"Joiner 'Paramount' Location.

" 'Dad' Joiner has gone right into the heart of one of the largest producing areas in all Texas, in his endeavor to make this the supreme achievement of his career. Take a good look at this map—notice how in most every direction—you'll find not just a few, but literally hundreds of producing areas. Notice the map of acreage on the following page—we have only a limited amount (all we could possibly obtain in an area like this)—so we earnestly advise you to get your application in at once!"

selves and through their agent, Johnson, used high pressure and fraudulent methods in inducing persons to make purchases from them. The coverage of the Act is limited to the sale, etc. of "securities" as defined in section 2(1),[7] and we do not think these sales and assignments are sales of securities as defined by such section, nor do we think that the high-pressure and fraudulent methods used serves to bring them within such definition. As suggested by the District Judge, there are available to the Government in proper cases the mail fraud statutes to stop such practices. To hold that such sales and assignments, which, as stated, are interests in land, are sales of securities would be stretching and straining the coverage of the Act far beyond what Congress intended.

There is much to be said in favor of the view that since Section 2(1) *includes* the sale or assignment of "fractional *undivided interest* in oil, gas, or other mineral rights," there are *excluded* sales or assignments of mineral rights in—not undivided interests—but specific tracts. We think, however, the true test is the title or rights of the purchaser after his purchase, i. e., what title, right, or interest the purchaser had after all had been said and done with respect to his purchase. That was the test in Atherton v. United States, 9 Cir., 128 F.2d 463, and in many other cases upon which appellant relies. The representations made by Corporation, et al. before or after the sale, whether true or false, are only pertinent insofar as they throw light on the rights of the purchaser after the sale. The record here shows that purchasers from Corporation of the leasehold interest in the 2½-acre to 20-acre tracts took under the laws of Texas an interest in land in the specific tract or tracts purchased by them, but no more. They took no interest in tracts of other purchasers, nor in unsold tracts of Corporation, nor in Corporation's well, nor any

production therefrom. They took what every purchaser of an interest in land takes, i. e., the chance that by the happening of some event—in this case the promised production of oil or gas in Corporation's well —the value of their tract might be increased, but that is the only benefit they would have received from the production from Corporation's well. And appellant's case is not helped by the fact that while each purchaser could have developed his tract, he probably did not intend to do so, but depended on Corporation to develop its holding, since, as stated, purchasers were to take no part of the proceeds of Corporation's development. Even if, as appellant apparently claims, the representation made by Corporation and Joiner that the well would be drilled and other similar representations were express or implied obligations by Corporation, such obligations did not serve to give purchasers a greater right or interest in their tracts than as stated. In some of the literature mailed by Corporation and Joiner, statements are made that the purchaser of a lease on a certain sized tract in McCulloch County would get "ten acres free" in the next block of acreage drilled by Corporation, but the record does not show that the purchaser's rights in the "free" ten acres were to be or were different from the rights of purchasers in the McCulloch County tracts.

This view is not out of harmony with the cases which appellant cites and presses upon us, except perhaps the Natural Resources Corporation case (8 S.E.C. 635, 1941).[8] In Atherton v. United States, supra, which was a prosecution against Atherton and others, charging violation of Section 17(a) (1) of the Act, 15 U.S.C.A. § 77q(a)(1), the question arose of whether the contracts, etc. between Atherton, et al. and purchasers from them were securities within the meaning of Section 2(1). There, leases on 2300 acres of land were sold in tracts of not less than 2½ acres

---

[7] Section 2(1) of the Act is as follows: "Sec. 2[§ 77b]. When used in this title [subchapter], unless the context otherwise requires—

"(1) The term 'security' means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a 'security', or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing."

[8] We cannot see our way clear to follow all the way the decision of the Commission in the Natural Resources Corporation case, passing upon facts very similar to the facts here.

near or surrounding 160 acres on which a well was to be drilled—the drilling site. It is there said (italics ours) [128 F.2d 465]:

"It is made clear in the indictment and in the proof that the purchasers looked entirely to the efforts of the promoters to make their investment a profitable one. The small leased acreage acquired by the individual purchaser was not itself susceptible of economic development, nor was the purchase made with the idea of independent exploitation. The leases were sold at prices ranging from $50 to $200 per acre upon the promise and representation that the proceeds of the sale would be used for bringing a well into production on the drill site, thus proving the productivity of the whole area under lease. It was proposed that when the well was completed the entire acreage, including the area selected as the drilling site, would be sold as one unit, and that each purchaser of an assignment would receive a proportionate share of the purchase price. *Clearly, the investor acquired more than a mere lease.*"

■ The other cases upon which appellant stands [9] do not differ greatly, if at all, from the Atherton case. In all the cases, the courts have brushed aside any camouflage, gone to the heart of the transactions, found the facts, and applied the definition Section 2(1). We have done so here, and find simply sales and assignments of legal and legitimate oil and gas leases, i. e., sales of interests in land. We believe that Congress intended to draw the line somewhere, and that it intended to exclude from the coverage of the Act such sales and assignments, leaving the right and privilege of making same unaffected by the Act, but, of course, leaving the Government free to proceed under the mail fraud or other appropriate statute against those who may, in the exercise of such right, defraud or seek to defraud the public.

We think the judgment appealed from should be and it is affirmed.

HUTCHESON, Circuit Judge, (dissenting).

I regard the majority opinion as a thorough and well reasoned exposition of the view it espouses, and would agree with it if I could accept the assumption upon which it is based that the purchasers got nothing by their purchases except "an interest in land in the specific tract or tracts purchased by them but no more". I cannot, however, accept this premise, for the record does not support the view of the opinion that no engagements whatever were made as to drilling a well or conducting an enterprise of any sort. It is true that no such express engagements were made, but it is equally true, especially in cases of fraud doing, that implied agreements bind as firmly as express ones. A careful reading of the record convinces me that here was no mere sale of leases. Here was also the sale of an interest in an enterprise, the drilling of exploratory wells on a block of leases by which drilling alone value was imparted to them. This is made plain both by the oral testimony and the exhibits. The exhibits are the conventional development letters spread with molasses to catch flies, the molasses being the understanding, implied in most of the cases and expressed in some of them, that an exploratory well would be drilled. For instance, in plaintiffs' Exhibit 17, Joiner advises that wells are in process of drilling and should be completed during August, and agrees "These developments should be of short duration. Therefore, we are here offering you leases around these two wells * * *. You may have 10 acres around one or both wells at $5.00 per acre cash payable by August 1, 1941, and $5.00 per acre additional, payable Nov. 1, 1941, or 30 days after both wells are completed. * * * This offer is limited and your offer must be in the mail by August 1, 1941. If it is in the mail when and if we strike the pay, your order will be filled, and we feel sure that you would have no opportunity later to *invest in leases around either of these two wells. This offer goes to you now who have at some time invested in a lease or leases around some well that the C. M. Joiner interests have drilled.*" (Emphasis supplied.)

[9] Atherton v. United States, 9 Cir., 128 F.2d 463. Securities and Exchange Commission v. Crude Oil Corporation of America, 7 Cir., 93 F.2d 844. Securities and Exchange Commission v. Wickham, D.C., 12 F.Supp. 245. Securities and Exchange Commission v. Universal Service Ass'n, 7 Cir., 106 F.2d 232. Securities and Exchange Commission v. Tung Corporation of America, D.C., 32 F.Supp. 371. Securities and Exchange Commission v. Pyne, D.C., 33 F.Supp. 988. Securities and Exchange Commission v. Payne, D.C., 35 F.Supp. 873. Securities and Exchange Commission v. Bailey, D.C., 41 F.Supp. 647.

At the end of one of his letters he says: "We know of no investment of greater promise than an investment in an oil lease around a drilling well in the State of Texas.

Climax!

*"In a continuation of our efforts to make you money, if you send in an order for twenty acres around either or both of these wells, after the date of this letter, you will get ten acres Free in the next block of acreage we drill which is most likely to be in Concho County, Texas. You will really be in the oil business."*

Johnson was enjoined as a dealer in investment contracts and properly so. Joiner ought to be enjoined for his own activities and for those of Johnson too. I think it plain under this evidence that Joiner was not merely selling oil leases, that is, interests in land, he was selling investment contracts, that is, leases coupled with an implied, if not in some cases, an express, obligation to give value to the lease by drilling exploratory wells. While then I agree with the majority that a mere sale of interests in land or leases without more does not make one a dealer in investment contracts, I think the judgment ought to be reversed because the proof here showed much more. What really occurred was a sale of a lease coupled with an implied contract to drill an exploratory well. I have little doubt that each of the purchasers acquired not only title to the lease he bought but a contract right against Joiner in respect of the oil development held out, and, therefore, that Joiner was dealing not merely in leases but in investment contracts. I respectfully Dissent.